# McLEAN TRUCKING CO. ET AL. v. UNITED STATES ET AL.

ET AL.

No. 31. Argued November 12, 15, 1943.—Decided January 17, 1944.

*Mr. Arne C. Wiprud,* with whom *Messrs. Robert H. Shields* and *Edward Dumbauld* were on the brief, for the Secretary of Agriculture of the United States, appellant. *Mr. E. B. Ussery* submitted for the McLean Trucking Co., and *Messrs. Martin Burns* and *Paul E. Mathias* submitted for the American Farm Bureau Federation,— appellants.

*Mr. Daniel W. Knowlton* for the Interstate Commerce Commission; and *Mr. Mortimer Allen Sullivan,* with whom *Mr. Hugh M. Joseloff* was on the brief, for Associated Transport, Inc. et al.,—appellees.

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

This is an appeal from a decree of a statutory three judge court,[1] 48 F. Supp. 933, refusing to set aside certain orders of the Interstate Commerce Commission which had authorized consolidation of seven large motor carriers.

Associated Transport, Inc., was organized in Delaware in March, 1941, to bring about the proposed merger. In July, 1941, it applied to the Interstate Commerce Commission for permission, under § 5 of the Interstate Commerce Act, as amended (49 U. S. C. § 5; 54 Stat. 898, 905), to obtain control of eight motor carriers, through purchase of their capital stock, and to consolidate their operating rights and properties into one unit within a year from the

---

[1] 28 U. S. C. §§ 44, 47, 47a, 345.

date it acquired stock control. At the same time, Associated applied for permission under § 214 of the Motor Carrier Act of 1935 (49 U. S. C. § 314; 49 Stat. 543, 557, 52 Stat. 1240, 54 Stat. 924) to issue preferred and common stock to be used mainly in exchange for stocks of the eight common carriers and four associated noncarriers.

Before the Commission, approval of the applications was opposed by the Secretary of Agriculture, the Anti-Trust Division of the Department of Justice, the National Grange, four fruit growers associations and Super Service Motor Freight Company, a motor carrier.[2] An examiner held hearings at which evidence was introduced, and the Commission heard argument on objections to his report before finally authorizing the consolidation.[3] 38 M. C. C. 137. McLean Trucking Company, Inc., a motor carrier which claims to compete with some of the carriers included in the merger, brought suit in the District Court to set aside the Commission's orders. The Secretary of Agriculture and the American Farm Bureau Federation intervened as plaintiffs. The United States confessed error. The Interstate Commerce Commission and the parties to the merger defended the Commission's order.

The principal issues, later set forth with particularity, are intertwined. They relate to whether the Commission applied a proper standard in concluding to approve the merger; whether it failed to give due weight to the prohibitions and policies of the anti-trust laws; and whether, upon the evidence and within the meaning of § 5 (2) (b)

---

[2] Other motor carriers, shippers and shippers' organizations intervened in the proceeding, as did also the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. Except for the latter, which at first opposed but ultimately supported the application, they took no position on the question whether the application should be approved.

[3] Three commissioners dissented. Approval of the merger was qualified by the imposition of certain conditions not here relevant.

of the Interstate Commerce Act, the Commission rightly could determine that Associated, upon consummation of the merger, would not be affiliated with any railroad. The Commission resolved all of these questions in favor of the merger, as did the District Court.

In one respect, however, the case as presented to the court was in different posture than as it came to the Commission. This change arose from the elimination of one of the constituent companies, Arrow Carrier Corporation, from the merger between the time the Commission's orders were rendered and the hearing in the District Court. After the suit was begun the Commission, on the applicant's petition, modified its orders to exclude Arrow. Accordingly the Commission also amended its answer to indicate the change, and the case was decided on the orders as modified. They present the only questions for our consideration. It may be noted that the elimination of Arrow has bearing upon the issue relating to anti-trust policy, but more particularly on that relating to railroad affiliation.

The eight carriers originally sought to be merged [4] were Arrow Carrier Corporation, Paterson, N. J.; Barnwell Brothers, Inc., Burlington, N. C.; Consolidated Motor Lines, Inc., Hartford, Conn.; Horton Motor Lines, Inc., Charlotte, N. C.; McCarthy Freight System, Inc., Taunton, Mass.; M. Moran Transportation Lines, Inc., Buffalo, N. Y.; Southeastern Motor Lines, Inc., Bristol Va.; and Transportation, Inc., Atlanta, Ga. The merger embraces some of the principal operators along the Atlantic seaboard from Massachusetts to Florida. Certain of them

---

[4] The four noncarriers, each associated with one of the carriers, are Barnwell Warehouse & Brokerage Company (associated with Barnwell), Brown Equipment & Manufacturing Company (associated with Horton), Conger Realty Company (associated with Horton), and Southern New England Terminals, Inc. (associated with McCarthy).

serve communities as far west as Cleveland, Ohio, Nash-
ville, Tennessee, and New Orleans, Louisiana. But the
most important effect will be to create an end-to-end
consolidation from points in the far South to New Eng-
land, with obviously large possibilities for through service.
According to evidence before the Commission the total
assets of the companies involved, as of April 30, 1941,
exceed $8,000,000 and their gross operating revenues
for 1940 exceeded $19,000,000. The carriers operate prin-
cipally as motor vehicle common carriers of general com-
modities over regular routes totalling 37,884 miles. Over
13,546 miles between important service points one or more
competes with others in the group.[5] This competitive
mileage will be eliminated by the merger, leaving a single
carrier with routes extending over 24,338 miles.

As a result of the proposed merger Associated will be
the largest single motor carrier in the United States—at
least in terms of its estimated revenues—and no other
single motor carrier will compete with it throughout its
service area. Nevertheless, after careful consideration
and on evidence clearly sufficient to sustain it, the Com-
mission found that on completion of the merger "there
would remain ample competitive motor-carrier service
throughout the territory involved" and in addition that

---

[5] The Commission found that Consolidated and McCarthy compete
substantially throughout Connecticut, Massachusetts and Rhode Island
but Consolidated alone operates between those areas and New York
City. Consolidated and Moran compete between the principal points
in New York State, but Moran's routes also extend to Cleveland, Ohio,
and to several points in northern Pennsylvania. There is some com-
petition among Arrow, Consolidated and Moran in New York, and
others of Arrow's routes parallel those of Barnwell and Horton. Barn-
well, Horton and Southeastern compete to some extent in parts of
the Middle Atlantic States (excluding New York). Barnwell, Horton
and Transportation, Inc., compete in portions of the southern region,
and Southeastern competes somewhat with them in that area.

one or more rail carriers would offer substantial competition to Associated at all principal points. It also found that the consolidation would result in improved transportation service. Through movement of freight would be simplified and expedited, equipment would be utilized more efficiently, terminal facilities improved, handling of shipments reduced, relations with shippers and public regulatory bodies simplified, safe operation promoted, and substantial operating economies would be achieved. The Commission concluded that the applicant's assumption of the fixed charges of the carriers would not be inconsistent with the public interest, and consummation of the proposed transaction would not result in substantial injury to the carrier employees affected.

In connection with Arrow's participation, the Commission found that The Transport Company, whose stock was wholly owned by Kuhn, Loeb and Company, had an option to purchase Arrow's common stock and would receive Associated's stock therefor when the merger was effected. The stock thus received, together with 9,000 shares of Associated's common stock already held, would give The Transport Company, and through it Kuhn, Loeb and Company, 6,877 shares of Associated's preferred and 67,167 of Associated's common, a total of 13 per cent and 9.53 per cent, respectively, of the preferred and common stocks expected to be outstanding at the conclusion of the transactions.[6] Kuhn, Loeb and Company is represented on the boards of directors of several railroads

---

[6] Associated is authorized by its charter to issue 100,000 shares of $100 par value preferred stock drawing six per cent cumulative dividends annually and 1,000,000 shares of $1.00 par value common stock. One of the conditions of the Commission's order here is that no par value be assigned the common stock. The Commission found that in exchange for all the outstanding stock of the merged companies (except a small quantity of the preferred stock of two of the carriers which was to be redeemed for cash) Associated was to issue

and for years has had investment banking connections with the Baltimore and Ohio and the Pennsylvania Railroads, each operating in territory to be served by Associated. A representative of Kuhn, Loeb and Company would be one of Associated's nine directors. After examining the blocks of stock which other persons would hold on completion of the consolidation and other matters bearing on the relationship between the proposed merger and the railroads, the Commission concluded that Associated would not be affiliated with any rail carriers. With the elimination of Arrow, of course, the likelihood of any influence on Associated's policies by Transport, and thus by Kuhn, Loeb and Company and the railroads, was substantially reduced.

## I.

The pertinent provisions of the Interstate Commerce Act, which is controlling, are set forth in the margin.[7]

648,643 shares of its common and 39,049 shares of its preferred stock, which on the cancellation of certain shares in connection with the stock of one of the noncarriers would leave outstanding 633,171 shares of common and 37,942 shares of preferred. Another 15,000 shares of preferred were to be offered to the public in order to enable Associated to obtain surplus cash. The preferred, which like the common was entitled to one vote per share, was convertible into common at the option of the holders, on terms not here relevant.

There were 71,480 shares of Associated's common stock outstanding at the time the application was filed, of which 31,240 were held by the president of Associated, 9,000 by The Transport Company (received for engineering accounting data given in connection with the merger), and the remainder by stockholders in the corporations to be merged.

[7] Section 5 provides in pertinent parts:

"Sec. 5. (1) Except upon specific approval by order of the Commission as in this section provided, and except as provided in paragraph (16) of section 1 of this part, it shall be unlawful for any common carrier subject to this part, part II, or part III to enter into any contract, agreement, or combination with any other such common

Section 5 (2) makes lawful a consolidation of the sort here attempted only if the Commission authorizes it. The Commission is empowered to authorize and approve a

carrier or carriers for the pooling or division of traffic, or of service, or of gross or net earnings, or of any portion thereof; and in any case of an unlawful agreement for the pooling or division of traffic, service, or earnings as aforesaid each day of its continuance shall be a separate offense: *Provided*, That whenever the Commission is of opinion, after hearing upon application of any such carrier or carriers or upon its own initiative, that the pooling or division, to the extent indicated by the Commission, of their traffic, service, or gross or net earnings, or of any portion thereof, will be in the interest of better service to the public or of economy in operation, and will not unduly restrain competition, the Commission shall by order approve and authorize, if assented to by all the carriers involved, such pooling or division, under such rules and regulations, and for such consideration as between such carriers and upon such terms and conditions, as shall be found by the Commission to be just and reasonable in the premises: . . .

"(2) (a) It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b)—

(i) for two or more carriers to consolidate or merge their properties or franchises, or any part thereof, into one corporation for the ownership, management, and operation of the properties theretofore in separate ownership; or for any carrier, or two or more carriers jointly, to purchase, lease, or contract to operate the properties, or any part thereof, of another; or for any carrier, or two or more carriers jointly, to acquire control of another through ownership of its stock or otherwise; or for a person which is not a carrier to acquire control of two or more carriers through ownership of their stock or otherwise; or for a person which is not a carrier and which has control of one or more carriers to acquire control of another carrier through ownership of its stock or otherwise; or

(ii) for a carrier by railroad to acquire trackage rights over, or joint ownership in or joint use of, any railroad line or lines owned or operated by any other such carrier, and terminals incidental thereto.

"(b) Whenever a transaction is proposed under subparagraph (a), the carrier or carriers or person seeking authority therefor shall pre-

consolidation either as applied for or as qualified by such terms and conditions as it deems "just and reasonable," if it finds that the merger "will be consistent with the

sent an application to the Commission, and thereupon the Commission shall notify the Governor of each State in which any part of the properties of the carriers involved in the proposed transaction is situated, and also such carriers and the applicant or applicants (and, in case carriers by motor vehicle are involved, the persons specified in section 205 (e)), and shall afford reasonable opportunity for interested parties to be heard. If the Commission shall consider it necessary in order to determine whether the findings specified below may properly be made, it shall set said application for public hearing, and a public hearing shall be held in all cases where carriers by railroad are involved. If the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed transaction is within the scope of subparagraph (a) and will be consistent with the public interest, it shall enter an order approving and authorizing such transaction, upon the terms and conditions, and with the modifications, so found to be just and reasonable: *Provided,* That if a carrier by railroad subject to this part, or any person which is controlled by such a carrier, or affiliated therewith within the meaning of paragraph (6), is an applicant in the case of any such proposed transaction involving a motor carrier, the Commission shall not enter such an order unless it finds that the transaction proposed will be consistent with the public interest and will enable such carrier to use service by motor vehicle to public advantage in its operations and will not unduly restrain competition.

"(c) In passing upon any proposed transaction under the provisions of this paragraph (2), the Commission shall give weight to the following considerations, among others: (1) The effect of the proposed transaction upon adequate transportation service to the public; (2) the effect upon the public interest of the inclusion, or failure to include, other railroads in the territory involved in the proposed transaction; (3) the total fixed charges resulting from the proposed transaction; and (4) the interest of the carrier employees affected.

·        ·        ·        ·        ·

"(6) For the purposes of this section a person shall be held to be affiliated with a carrier if, by reason of the relationship of such per-

public interest." § 5 (2) (b). In passing upon a proposed consolidation the Commission is required to "give weight to the following considerations, among others: (1) The effect of the proposed transaction upon adequate transportation service to the public; . . . (3) the total fixed charges resulting from the proposed transaction; and (4) the interest of the carrier employees affected." § 5 (2) (c). The foregoing provisions supply the general statutory standards for guiding the Commission's judgment; and within their broad limits, its authority is "exclusive and plenary." § 5 (11).

However, in two particulars, pertinent especially to the issues concerning anti-trust policy and railroad affiliation, § 5 lays down more explicit commands. One is a specific exemption of carriers and individuals participating in an approved merger "from the operation of the antitrust laws and of all other restraints, limitations, and prohibitions of law, Federal, State, or municipal, insofar as may be necessary to enable them to carry into effect the trans-

---

son to such carrier (whether by reason of the method of, or circumstances surrounding organization or operation, or whether established through common directors, officers, or stockholders, a voting trust or trusts, a holding or investment company or companies, or any other direct or indirect means), it is reasonable to believe that the affairs of any carrier of which control may be acquired by such person will be managed in the interest of such other carrier.

"(11) The authority conferred by this section shall be exclusive and plenary, . . . and any carriers or other corporations, and their officers and employees and any other persons, participating in a transaction approved or authorized under the provisions of this section shall be and they are hereby relieved from the operation of the antitrust laws and of all other restraints, limitations, and prohibitions of law, Federal, State, or municipal, insofar as may be necessary to enable them to carry into effect the transactions so approved or provided for in accordance with the terms and conditions, if any, imposed by the Commission, and to hold, maintain, and operate any properties and exercise any control or franchises acquired through such transaction."

actions so approved . . . and to hold, maintain, and operate any properties and exercise any control or franchises acquired through such transaction." § 5 (11). The other provides the standards to be applied in cases of affiliation of a motor carrier with a railroad. Where a railroad or "any person which is controlled by such a carrier, or affiliated therewith"[8] is an applicant in a consolidation proceeding, the Commission cannot approve the merger "unless it finds that the transaction proposed will be consistent with the public interest and will enable such carrier to use service by motor vehicle to public advantage in its operations and will not unduly restrain competition." § 5 (2) (b). In the light of these controlling statutory provisions the issues must be stated more sharply for proper perspective of what is at stake.

## II.

As has been said, they are intertwined. This is true especially of the issues concerning the propriety of the standards applied and whether due consideration was given to the anti-trust laws and policies, although the question of rail affiliation is closely related to both.

The chief attack on the orders is that the Commission improperly construed the standards by which Congress intended it to determine the propriety of a consolidation; and the burden of this complaint is that it did so "by failing to consider and give due weight to the anti-trust and other laws of the United States." The argument seems to be that the merger, notwithstanding the Commission's approval, violates the Sherman Act; hence the Commission is without power to approve the merger. This presupposes that Congress did not intend, by enacting the specific exemption of § 5 (11), to give the Commission leeway to approve any merger which, but for the ex-

---

[8] "Affiliated therewith" is defined in § 5 (6), *supra* note 7.

emption and the Commission's approval, would run afoul of the anti-trust laws. In other words, the Commission's authority is not "exclusive and plenary," as the section declares, within the boundaries set by the Interstate Commerce Act, including the exemption; but it is restricted also by all the ramifications of the anti-trust laws and policies, to which the Commission must give strict regard in approving motor consolidations, as if the exemption did not exist.

It is conceded this is not true of rail consolidations, though they are authorized, and subjected to the same standards, by the identical sections of the statute. A difference in application of the language is said to arise from the difference which existed in the conditions under which rail and motor carriers, respectively, were brought within the purview of the statutory commands. Thus, it is said, the Transportation Act of 1920 (41 Stat. 456) made a broad departure from previous policy by relieving rail consolidations, with the Commission's approval, from anti-trust restrictions in order to rehabilitate a broken-down industry. But, it is also said, such a condition did not characterize motor carriers when they were brought under regulation in 1935 or at the time of any subsequent legislation affecting them. Hence, it is admitted the Commission with propriety may approve a rail consolidation, otherwise prohibited by the anti-trust laws, in order to bring about needed or desirable improvement in service and economies in operation. But, as to motor carriers, it is urged the consolidation cannot be effected with any such purposes or consequences. Only when the existing service is inadequate and consolidation is necessary to bring about adequate service to the public, the argument runs, can the Commission approve it.

On its face the contention would seem to run in the teeth of the language and the purpose of § 5 (11). Nothing in its terms indicates an intention to create one au-

thority for rail consolidations and another for motor mergers. Identical provisions govern both. And to restrict the application of the section to motor carriers in the manner urged would nullify its operation as to them. The attack, when carried to such an extent, comes down to one upon the policy which Congress has declared. It has done so in terms which do not admit of nullification by reference to the varying conditions under which different types of carriers were brought within the statute's operation. It is not for this Court, or any other, to override a policy, or an exemption from one, so clearly and specifically declared by Congress, whatever may be our views of the wisdom of its action. The argument in its full sweep therefore must be rejected. But, taken for less than that, it poses a problem of accommodation of the Transportation Act and the anti-trust legislation, to which we now turn. In doing so we note that the former is the later in time and constitutes not only a more recent but a more specific expression of policy.

## III.

To secure the continuous, close and informed supervision which enforcement of legislative mandates frequently requires, Congress has vested expert administrative bodies such as the Interstate Commerce Commission with broad discretion and has charged them with the duty to execute stated and specific statutory policies. That delegation does not necessarily include either the duty or the authority to execute numerous other laws. Thus, here, the Commission has no power to enforce the Sherman Act as such. It cannot decide definitively whether the transaction contemplated constitutes a restraint of trade or an attempt to monopolize which is forbidden by that Act. The Commission's task is to enforce the Interstate Commerce Act and other legislation which deals specifically with transportation facilities and problems. That

legislation constitutes the immediate frame of reference within which the Commission operates; and the policies expressed in it must be the basic determinants of its action.

But in executing those policies the Commission may be faced with overlapping and at times inconsistent policies embodied in other legislation enacted at different times and with different problems in view. When this is true, it cannot, without more, ignore the latter. The precise adjustments which it must make, however, will vary from instance to instance depending on the extent to which Congress indicates a desire to have those policies leavened or implemented in the enforcement of the various specific provisions of the legislation with which the Commission is primarily and directly concerned. Cf. *National Broadcasting Co.* v. *United States,* 319 U. S. 190; *New York Central Securities Corp.* v. *United States,* 287 U. S. 12.

The national transportation policy is the product of a long history of trial and error by Congress in attempting to regulate the nation's transportation facilities beginning with the Interstate Commerce Act of 1887.[9] For present purposes it is not necessary to trace the history of those attempts in detail other than to note that the Transportation Act of 1920 marked a sharp change in the policies and objectives embodied in those efforts.[10] "Theretofore, the effort of Congress had been directed mainly to the prevention of abuses; particularly, those arising from ex-

---

[9] 24 Stat. 379. See Sharfman, The Interstate Commerce Commission (1935), Part I, 11–20, and authorities cited, for a concise compilation of the more important legislation implementing the Interstate Commerce Act of 1887 and a reference to some of the impulses leading to the adoption of that Act; see also Healy, The Economics of Transportation (1940) ch. 18 *et seq.*

[10] Compare the Interstate Commerce Act of 1887, 24 Stat. 379, and the statutes collected in Sharfman, *supra* note 9, with the Transporta-

cessive or discriminatory rates";[11] and emphasis on the preservation of free competition among carriers was part of that effort.[12] The Act of 1920 added "a new and important object to previous interstate commerce legislation." It sought "affirmatively to build up a system of railways prepared to handle promptly all the interstate traffic of the country." *Dayton-Goose Creek Ry. Co.* v. *United States,* 263 U. S. 456, 478; *Texas & Pacific Ry. Co.* v. *Gulf, C. & S. F. Ry. Co.,* 270 U. S. 266, 277. And in administering it, the Commission was to be guided primarily by consideration for "adequacy of transportation service, . . . its essential conditions of economy and efficiency, and . . . appropriate provision and best use of transportation facilities. . . ." *New York Central Securities Corp.* v. *United States,* 287 U. S. 12, 25.

Since that initial effort at reshaping regulation of railroads to "ensure . . . adequate transportation service," [13] Congress has extended federal regulation in connection with other forms of transportation [14] and has elaborated

tion Act of 1920, 41 Stat. 456 (see also MacVeagh, The Transportation Act of 1920 (1923)), the Emergency Transportation Act of 1933, 48 Stat. 211, and the Transportation Act of 1940, 54 Stat. 898. See also Annual Reports of the Interstate Commerce Commission for 1888, pp. 25–26; 1892, pp. 47–55; 1893, p. 9; 1894, p. 63; 1897, pp. 48–51; 1898, pp. 18–22; 1900, p. 13; 1918, pp. 4–9; 1919, pp. 1–6. See generally, Johnson, Government Regulation of Transportation (1938); Nelson, The Role of Regulation Reexamined, Transportation and National Policy, National Resources Planning Board (May, 1942) 197.

[11] *The New England Divisions Case,* 261 U. S. 184, 189.

[12] Cf. authorities cited *supra* notes 9 and 10. The Interstate Commerce Act of 1887 (24 Stat. 379) was in a sense a shadow cast by the coming Sherman Act (26 Stat. 209). Compare Snyder, The Interstate Commerce Act and Federal Anti-Trust Laws (1904) 121–122.

[13] *The New England Divisions Case,* 261 U. S. 184, 189.

[14] Cf. e. g., Air Commerce Act of 1926, 44 Stat. 568, as amended by 48 Stat. 1113; Air Mail Act of 1934, 48 Stat. 933; Air Mail Act of 1935, 49 Stat. 614; Civil Aeronautics Act of 1938, 52 Stat. 973; Motor

more fully the objectives to be achieved by its legislation. In 1935 it enacted a comprehensive scheme of regulation for motor carriers, designed to result in "a system of co-ordinated transportation for the Nation which will supply the most efficient means of transport and furnish service as cheaply as is consistent with fair treatment of labor and with earnings which will support adequate credit and the ability to expand as need develops and to take advantage of all improvements in the art." [15] The policy which was to guide the Commission in administering that Act was fully stated [16] and has since been absorbed into the equally full statement of the national transportation policy. That policy, which is the Commission's guide to "the public interest," cf. *New York Central Securities Corp.* v. *United States,* 287 U. S. 12; *Texas* v. *United States,* 292 U. S. 522, demands that all modes of transportation subject to the provisions of the Interstate Commerce Act be so regulated as to "recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers;

Carrier Act of 1935, 49 Stat. 543; and compare Title II of the Transportation Act of 1940, 54 Stat. 898, 929.

[15] Sen. Rep. No. 482, 74th Cong., 1st Sess., 3.

[16] "It is hereby declared to be the policy of Congress to regulate transportation by motor carriers in such manner as to recognize and preserve the inherent advantages of, and foster sound economic conditions in, such transportation and among such carriers in the public interest; promote adequate, economical, and efficient service by motor carriers, and reasonable charges therefor, without unjust discriminations, undue preferences or advantages, and unfair or destructive competitive practices; improve the relations between, and coordinate transportation by and regulation of, motor carriers and other carriers; develop and preserve a highway transportation system properly adapted to the needs of the commerce of the United States and of the national defense; and cooperate with the several States and the duly authorized officials thereof and with any organization of motor carriers in the administration and enforcement of this part." 49 Stat. 543.

to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; . . . all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense." 54 Stat. 899.

The history of the development of the special national transportation policy suggests, quite apart from the explicit provision of § 5 (11), that the policies of the antitrust laws determine "the public interest" in railroad regulation only in a qualified way. And the altered emphasis in railroad legislation on achieving an adequate, efficient, and economical system of transportation through close supervision of business operations and practices rather than through heavy reliance on the enforcement of free competition in various phases of the business, cf. *New York Central Securities Corp.* v. *United States,* 287 U. S. 12, has its counterpart in motor carrier policy. The premises of motor carrier regulation posit some curtailment of free and unrestrained competition.[17] The origins [18] and legislative

---

[17] No motor carrier can operate in interstate commerce without a certificate of public convenience and necessity, 49 U. S. C. § 306, 49 Stat. 551, 52 Stat. 1238, 54 Stat. 923. Compare Monograph No. 21, Temporary National Economic Committee, 76th Cong., 3d Sess., 268.

The Reports of the Coordinator of Transportation (Sen. Doc. No. 152, 73d Cong., 2d Sess.; H. Doc. 89, 74th Cong., 1st Sess.) on which the Act is in large measure based (79 Cong. Rec. 12207; Sen. Rep. No. 482, 74th Cong., 1st Sess.; H. R. Rep. No. 1645, 74th Cong., 1st Sess.) disclose graphically that among the evils with which the motor carrier industry was afflicted and which would be cured by the Act was unrestrained competition. It was anticipated that the Act would confer benefits on the industry "by promoting a more orderly conduct of the business, lessening irresponsible competition and undue internal strife, encouraging the organization of stronger units, and otherwise enabling

history [19] of the Motor Carrier Act adequately disclose that in it Congress recognized there may be occasions when "competition between carriers may result in harm to the public as well as in benefit; and that when a [carrier] inflicts injury upon its rival, it may be the public which ultimately bears the loss." Cf. *Texas & Pacific Ry. Co.* v. *Gulf, C. & S. F. Ry. Co.*, 270 U. S. 266, 277.

Whatever may be the case with respect either to other kinds of transactions by or among carriers [20] or to consolidations of different types of carriers,[21] there can be little doubt

---

the industry to put itself on a sounder and more generally profitable basis." H. Doc. 89, 74th Cong., 1st Sess. (1934) 127.

[18] See particularly the Reports of the Coordinator of Transportation, cited *supra* note 17.

[19] Sen. Rep. No. 482, 74th Cong., 1st Sess.; 79 Cong. Rec. 12206.

[20] Even after the major shift in policy reflected in the Transportation Act of 1920, Congress left it abundantly clear that the preservation of competition and the elimination of monopolistic practices in many phases of the transportation industry was a desideratum. See e. g., 15 U. S. C. §§ 13, 14, 18–21; 38 Stat. 730 *et seq.*, 48 Stat. 1102, 49 Stat. 1526–1528; 31 I. C. C. 32, 61; 31 I. C. C. 351, 413–414; and § 5 (1) of the Interstate Commerce Act, 41 Stat. 480–481; 54 Stat. 905; and compare *Chesapeake & Ohio Ry. Co.* v. *United States*, 283 U. S. 35.

[21] Cf. 49 U. S. C. § 5 (14)–(16); 37 Stat. 566, 41 Stat. 482, 54 Stat. 909. In connection with the consolidation of rail and motor carriers Congress was explicit on the subject of competition in its mandate to the Commission. Fearful of the dangerous potentialities which such coordination might create (see 79 Cong. Rec. 5654–5655, 12206, 12222–12225) Congress prescribed more rigorous requirements for that process than for simple motor carrier consolidations. For the latter approval may be granted if the Commission finds the transaction "consistent with the public interest." For a rail carrier to consolidate with a motor carrier, Commission approval requires a finding that the transaction will "be consistent with the public interest and will enable such carrier to use service by motor vehicle to public advantage in its operations and will not unduly restrain competition." Compare the language of § 213 (a) of the Motor Carrier Act of 1935, 49 Stat. 555–556, 52 Stat. 1239, (and cf. 86 Cong. Rec. 11546) with that of § 5 of the Transportation Act of 1940.

that the Commission is not to measure proposals for all-rail or all-motor consolidations by the standards of the anti-trust laws. Congress authorized such consolidations because it recognized that in some circumstances they were appropriate for effectuation of the national transportation policy. It was informed that this policy would be furthered by "encouraging the organization of stronger units" in the motor carrier industry.[22] And in authorizing those consolidations it did not import the general policies of the anti-trust laws as a measure of their permissibility.[23] It in terms relieved participants in appropriate mergers from the requirements of those laws. § 5 (11). In doing so, it presumably took into account the fact that the business affected is subject to strict regulation and supervision, particularly with respect to rates charged the public—an effective safeguard against the evils attending monopoly, at which the Sherman Act is directed. Against this background, no other inference is possible but that, as a factor in determining the propriety of motor-carrier consolidations the preservation of competition among carriers, although still a value,[24] is significant chiefly as it aids in the

---

[22] Cf. note 17 *supra*. Authorization of consolidation of rail carriers stems historically from circumstances different from those impelling the authorization of consolidation of motor carriers. Compare authorities cited in notes 9 and 10 *supra* with those in notes 17–19 *supra*. This difference in origins is not entirely to be ignored simply because the same provisions of § 5 now govern both motor carrier and rail carrier consolidations. Cf. 86 Cong. Rec. 11546. But whatever effect the difference may have, as a guide to the Commission concerning the extent to which and circumstances in which consolidation should be allowed, it cannot nullify the power given to the Commission by § 5 (11).

[23] Compare the provisions of the statutes cited *supra* notes 20 and 21.

[24] Cf. note 26 *infra;* compare also 41 Stat. 481–482; *Chesapeake & Ohio Ry. Co.* v. *United States*, 283 U. S. 35; MacVeagh, The Transportation Act of 1920 (1923) 275–292.

attainment of the objectives of the national transportation policy.

Therefore, the Commission is not bound, as appellants urge, to accede to the policies of the anti-trust laws so completely that only where "inadequate" transportation facilities are sought to be made "adequate" by consolidation can their dictates be overborne by "the public interest." That view, in effect, would require the Commission to permit only those consolidations which would not offend the anti-trust laws. As has been said, this would render meaningless the exemption relieving the participants in a properly approved merger of the requirements of those laws, and would ignore the fact that the Motor Carrier Act is to be administered with an eye to affirmatively improving transportation facilities, not merely to preserving existing arrangements or competitive practices.[25] Compare *Dayton-Goose Creek Ry. Co.* v. *United States, supra; The New England Divisions Case, supra.*

Congress however neither has made the anti-trust laws wholly inapplicable to the transportation industry nor has authorized the Commission in passing on a proposed merger to ignore their policy. Congress recognized that the process of consolidating motor carriers would result in some diminution of competition and might result in the creation of monopolies. To prevent the latter effect and to make certain that the former was permitted only where appropriate to further the national transportation policy, it placed in the Commission power to control such developments.[26] The national transportation policy re-

---

[25] Cf. note 17 *supra.*

[26] E. g., Senator Wheeler, in charge of the measure in the Senate, said:

"At present most truck operations are small enterprises. However, there are many rumors of plans for the merging of existing operations into sizable systems. In view of past experience with railroad and public-utility unifications, it is regarded as necessary that the Com-

quires the Commission to "promote . . . economical . . . service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, [or] undue preferences or advantages. . . ." The preservation of independent and competing motor carriers unquestionably has bearing on the achievement of those ends. Hence, the fact that the carriers participating in a properly authorized consolidation may obtain immunity from prosecution under the anti-trust laws in no sense relieves the Commission of its duty, as an administrative matter, to consider the effect of the merger on competitors and on the general competitive situation in the industry in the light of the objectives of the national transportation policy.

In short, the Commission must estimate the scope and appraise the effects of the curtailment of competition which will result from the proposed consolidation and consider them along with the advantages of improved service, safer operation, lower costs, etc., to determine whether the consolidation will assist in effectuating the over-all transportation policy. Resolving these considerations is a complex task which requires extensive facilities, expert judgment and considerable knowledge of the transportation industry. Congress left that task to the Commission "to the end that the wisdom and experience of that Commission may be used not only in connection with this form of transportation, but in its coordination of all other forms." 79 Cong. Rec. 12207. "The wisdom and experience of that commission," not of the courts, must determine whether the proposed consolidation is

mission have control over such developments, where the number of vehicles involved is sufficient to make the matter one of more than local importance." 79 Cong. Rec. 5654–5655.

"consistent with the public interest." Cf. *Interstate Commerce Commission* v. *Illinois Central R. Co.,* 215 U. S. 452; *Pennsylvania Co.* v. *United States,* 236 U. S. 351; *United States* v. *Chicago Heights Trucking Co.,* 310 U. S. 344; *Purcell* v. *United States,* 315 U. S. 381. If the Commission did not exceed the statutory limits within which Congress confined its discretion and its findings are adequate and supported by evidence, it is not our function to upset its order.

## IV.

The Commission found, as has been noted, that the proposed consolidation would result in improved transportation service, greater efficiency of operation and substantial operating economies. The higher load factor on trucks, reduction in the number of trucks used and the mileage traversed would lead to more efficient use of equipment and save motor fuel. Terminal facilities would be consolidated and used more effectively, through movement of freight would reduce costs and in a multitude of other ways the stability and safety of the service rendered would be enhanced.[27] The Commission also considered the extent to which competition among the merging carriers would be diminished, the effects of the consolidation on competing carriers and the consequences for transportation service and motor carrier operations in general in the areas affected. It found that in each of the areas served by the present components of the merger there are from 44 to more than 100 Class I carriers, many

---

[27] E. g., tracing shipments and settlement of claims would be facilitated, congestion at shipping platforms would be reduced, the average life of the equipment would be lengthened by scientific maintenance and safety programs on a large scale, vehicles would be shifted quickly to meet peak demands on certain routes, etc.

of which were regular route common carriers of general commodities, comparable in size—insofar as size is disclosed by operating revenues—to some of the participants in the consolidation. Between the principal points in each of the areas served substantial competition by independent Class I carriers now exists. While none of these carriers operates a through service over the entire area to be served by Associated, the Commission found that rail carrier service competes at all the principal points to be served by Associated, and that contract carriers also offer competition.

The Commission determined, on the basis of facts appearing in the record and its experience with other consolidations, that it was not likely that Associated's size and competitive advantages would enable it to control the price and character of interchange traffic, to drain off substantial amounts of shippers' business or in other ways to smother the competition of other motor carriers. It concluded that ample competition would remain and, weighing all the factors, that the consolidation was "consistent with the public interest."

Necessarily in its inquiry the Commission had to speculate to some extent as to the future consequences and effects of a present consolidation. But it based its judgment on available facts as to present operations and business practices and past experience with transportation operations and analogous transactions.

We cannot say that the Commission measured "the public interest" by standards other than those Congress provided or that its findings do not comply with the requirements of the Act. The material findings are supported by evidence; and while a more meticulous regard for its function might have impelled the Commission to accede to the Anti-Trust Division's request for certain information from other shippers bearing on the question of

competition, we do not think its failure to do so requires, on this record, that its conclusions be overturned.

## V.

Appellants also attack the propriety of the Commission's conclusion that Associated is not, and would not be, on consummation of the consolidation, "affiliated" with any railroad. Whatever might have been the case if Arrow had been included in the merger, a different question is presented by the orders now under review.

Section 5 (2) provides:

"That if . . . any person which is controlled by a [rail] carrier, or affiliated therewith within the meaning of paragraph (6), is an applicant in the case of any such proposed transaction involving a motor carrier, the Commission shall not enter such an order unless it finds that the transaction proposed will be consistent with the public interest and will enable such carrier to use service by motor vehicle to public advantage in its operations and will not unduly restrain competition."

Section 5 (6) provides:

"For the purposes of this section a person shall be held to be affiliated with a carrier if, by reason of the relationship of such person to such carrier (whether by reason of the method of, or circumstances surrounding organization or operation, or whether established through common directors, officers, or stockholders, a voting trust or trusts, a holding or investment company or companies, or any other direct or indirect means), it is reasonable to believe that the affairs of any carrier of which control may be acquired by such person will be managed in the interest of such other carrier."

The only relevant evidence now pointing toward affiliation of the applicant with rail carriers are the facts that Kuhn, Loeb and Company indirectly owns 9,000 shares

of Associated's common stock, has one representative among the nine directors of Associated, has investment banking connections with competing rail carriers, and is represented on the boards of directors of other railroads. For present purposes we may assume that by virtue of those connections the rail carriers' interests will be the banking house's interests in directing the affairs of Associated. But aside from the proportionately small (9,000 out of 1,000,000 common shares) stock ownership and the place on the board of directors, the Commission found no connection—either in the origins of the present proposal or in personnel, financing or otherwise—between Kuhn, Loeb and Company and the rail carriers on the one hand and Associated on the other. This contrasts sharply with the circumstances in Transport Co., 36 M. C. C. 61, where a much larger merger of eastern motor carrier operators, sought to be consummated with at least the assistance of Kuhn, Loeb and Company, was denied approval by the Commission. And in the present merger others, not associated, so far as this record shows, with Kuhn, Loeb and Company or rail carriers would have substantial blocks of stock.[28] We cannot find anything arbitrary or unreasonable in the conclusion that the consolidation as finally authorized will not result in Associated's being affiliated with a carrier by rail. It may be added that under the Commission's order in this case the relatively close holdings which will emerge from the consolidation cannot be altered without the Commission's approval. And it is the consolidation as approved which is exempted from the operation of the anti-trust laws and the prohibition against rail affiliation without approval. Any future

---

[28] E. g., H. D. Horton and the members of his family will own 14,917 shares of Associated's preferred stock and 267,873 shares of its common stock. The stockholders of Consolidated also would own substantially greater blocks than the 9,000 shares which Kuhn, Loeb and Company controls.

change which may bring the consolidation into clash with either prohibition may be considered when it arises.

Accordingly the judgment is

*Affirmed.*

MR. JUSTICE MURPHY is of the opinion that the judgment should be reversed.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting:

I think that the Commission misconceived its authority under the merger and consolidation provisions of the Act. I agree that the Commission is not to measure motor vehicle consolidations by the standards of the anti-trust acts. Such a construction would make largely meaningless, as the opinion of the Court demonstrates, the power of the Commission under § 5 (11) to relieve participants in mergers or consolidations from the requirements of those acts. But I think a proper construction of the Act requires the Commission to give greater weight to the principles of competition than it apparently has done here.

I agree that the standard of the "public interest" which governs mergers and consolidations under § 5 embraces the national transportation policy contained in the Act. That declared policy calls, among other things, for the recognition and preservation of "the inherent advantages" of motor vehicle transportation; the promotion of "safe, adequate, economical, and efficient service" and the fostering of "sound economic conditions in transportation and among the several carriers"; the establishment and maintenance of reasonable charges "without unjust discriminations, undue preference or advantages, or unfair or destructive competitive practices"—to the end of "developing, coordinating, and preserving a national transportation system" which is "adequate to meet" the national needs.  54 Stat. 899.  Those standards are specifically re-

ferred to in § 5 (2) (c) where an itemization of some of the factors to which the Commission shall give weight is made. And the preamble itself states that "All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy."

But I am of the opinion that the concept of the "public interest" as used in § 5 also embraces the anti-trust laws. Those laws extend to carriers as well as to other enterprises. But for the approval of the Commission the present consolidation would run afoul of the Sherman Act. *United States* v. *Southern Pacific Co.*, 259 U. S. 214. And the Clayton Act (which makes specific references to common carriers) by § 11 expressly entrusts the Commission with the authority of enforcement of its provisions "where applicable to common carriers." 38 Stat. 734, 15 U. S. C. § 21. Those laws still stand. We thus have a long standing policy of Congress to subject these common carriers to the anti-trust laws. And we should remember that, so far as motor vehicles are concerned, we are dealing with transportation units whose rights of way—the highways of the country—have been furnished by the public. These considerations indicate to me that while the power of Congress to authorize the Commission to lift the ban of the anti-trust laws in favor of common carriers is clear (*New York Central Securities Corp.* v. *United States*, 287 U. S. 12, 25–26), administrative authority to replace the competitive system with a cartel should be strictly construed. I would read § 5 of the Transportation Act so as to make for the greatest possible accommodation between the principles of competition and the national transportation policy. The occasions for the exercise of the administrative authority to grant exemptions from the anti-trust laws should be closely confined to those where the transportation need is clear.

If it were the opinion of the Commission that the policy of the Transportation Act would be thwarted unless a particular type of merger or consolidation were permitted, I have no doubt that it would be authorized to lift the ban of the anti-trust laws. But unless such necessity or need were shown I do not think the anti-trust laws should be made to give way. Congress did not give the Commission *carte blanche* authority to substitute a cartel for a competitive system. It may so act only when that step "will be consistent with the public interest." § 5 (2) (b). But since the "public interest" includes the principles of free enterprise, which have long distinguished our economy, I can hardly believe that Congress intended them to be swept aside unless they were in fact obstacles to the realization of the national transportation policy. But so far as we know from the present record that policy may be as readily achieved on a competitive basis as through the present type of consolidation. At least such a powerful combination of competitors as is presently projected is not shown to be necessary for that purpose. In this case the hand of the promoter seems more apparent than a transportation need.

For these reasons I would resolve the ambiguities of the Act in favor of the maintenance of free enterprise. If that is too niggardly an interpretation of the Act, Congress can rectify it. But if the Commission is allowed to take the other view,[1] a pattern of consolidation will have been approved which will allow the cartel rather than the competitive system to dominate this field. His-

---

[1] The position here taken is substantially the view which originally obtained in the Commission. Northland-Greyhound Lines, Inc., 5 M. C. C. 123; Richmond-Greyhound Lines, Inc., 35 M. C. C. 555. But that view did not long obtain. See Northland-Greyhound Lines, Inc., 25 M. C. C. 109; Richmond-Greyhound Lines, Inc., 36 M. C. C. 747. And see Meck & Bogue, Federal Regulation of Motor Carrier Unification, 50 Yale L. Journ. 1376, 1393–1397.

tory shows that it is next to impossible to turn back the clock once such a trend gets under way.

But there is another phase of the case which in my view requires a reversal of the judgment below. The Commission has allowed the investment banker of railroad companies to be represented on the board of the motor vehicle company. It did so after a finding that it was not "reasonable to believe that the affairs of applicant would be managed in the interest of any railroad" and therefore that the motor vehicle company would not be affiliated with any railroad within the meaning of the Act. § 5 (5) (a), (6). But though we assume there was no such affiliation, I agree with Commissioner Patterson that that is not the end of the matter. The question still remains whether it is "consistent with the public interest" to allow such a banker's nexus between the two competitors. I cannot believe that Congress intended the Commission to treat such a matter as inconsequential. The whole history of finance urges caution when one investment banker stakes out his claim to two competing companies. Experience shows that when one gains a seat at his competitor's table, it is the beginning of the end of competition. A new zone of influence has been created. Its efficacy turns not on the amount of stock ownership but on a host of subtle and imponderable considerations. Such an intertwined relationship has been "the root of many evils" (Brandeis, Other People's Money, p. 51) and so demonstrably inimical to the "public interest" in the past as not to be disregarded today.

I agree that if § 5 were read as the Court reads it, the order of the Commission should be affirmed. But since the Commission took a view of the law which in my opinion was erroneous, I would reverse the judgment below so that the case might be returned to the Commission for reconsideration of the application under the proper construction of § 5.