595 F.2d 379
 ROGERS CARTAGE CO., et al., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
and
Ruan Transport Corporation and Harold Waggoner & Co.,
Intervening Respondents.
 No. 78-1573.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 5, 1979.
Decided March 27, 1979.
 
 Leonard R. Kofkin, Chicago, Ill., for petitioners.
 Kathleen M. Dollar, I. C. C., Roland Rice, Washington, D. C., for intervening respondents.
 Before TONE and WOOD, Circuit Judges, and EAST, Senior District Judge.*
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 Petitioners seek review of orders of the Interstate Commerce Commission in dockets, MC-F-12207. Ruan Transport Corp. Purchase Harold Waggoner & Co., and MC-107496 (Sub. No. 951) Ruan Transport Corp. Common Carrier Application, consolidated proceedings. 122 M.C.C. 777 (1977); 127 M.C.C. 52 (1977). In the first docket the Commission allowed Ruan to purchase certain contract carrier permits of Waggoner and in the second granted Ruan's application to convert the purchased contract carrier operating permits to common carrier operating certificates pursuant to 49 U.S.C. §§ 5 and 307. We affirm the Commission.
 
 
 2
 As a contract carrier Waggoner holds authority to transport, with restrictions, various liquid chemicals in bulk over irregular routes from St. Louis, Missouri, and East St. Louis, Illinois, to points in a block of 30 states. Waggoner's authority was derived from three sources: (1) a base permit allowing service to 15 states and unrestricted as to the shippers that could be served, (2) a Sub-No. 5 permit authorizing service to 15 additional states but restricted to service under a contract with Monsanto Chemical Co., and (3) a Sub.-No. 6 permit authorizing the transportation of pentachlorophenol from St. Louis and East St. Louis to destinations in 20 states restricted to service under contracts with Wood Treating Chemicals Co. and Associated Sales and Supply Co. The Commission determined that this last permit was dormant and not transferable. That determination is not directly an issue in this appeal.
 
 
 3
 The Administrative Law Judge in 1976 granted both the purchase application and the conversion subject to a determination in a later proceeding as to Ruan's "fitness" as a common carrier.
 
 
 4
 Division 3 of the Commission approved Ruan's certification in 1977, but modified the authority granted by the Administrative Law Judge. Ruan Transport Corp. Purchase Harold Waggoner & Co., 122 M.C.C. 777 (1977). Waggoner's traffic abstract from January 2, 1973, to March 14, 1974, indicated that there were no shipments to two destination states in the base permit, no shipments to 10 destination states in the Sub.-No. 5 permit, and no shipments to any states in the Sub.-No. 6 permit. Saying a clear showing of public convenience and necessity was required for conversion from contract to common carrier authority, the Commission declared:
 
 
 5
 An applicant must demonstrate a need for the entire proposed service, not simply some portion of it. . . .
 
 
 6
 In the instant proceeding, the record does not support a grant of authority coextensive with the permits held by Waggoner. Waggoner, clearly, did not serve a significant number of its destination states . . . .
 
 
 7
 In our opinion, statements that a proposed service might be utilized, are insufficient to demonstrate a need.
 
 
 8
 122 M.C.C. at 781. The division then sliced off the 12 destination states in Waggoner's base and Sub.-No. 5 permits in which no shipments were made and the entire Sub.-No. 6 permit. The Commission also determined that Ruan's certification as modified should be granted Instanter.
 
 
 9
 After petitions for reconsideration were filed by the applicants and several competing carriers, Division 3 of the Commission, acting as an Appellate Division, determined that the prior decision was erroneous. Ruan Transport Corp. Purchase Harold Waggoner & Co., 127 M.C.C. 52 (1977). The Commission adopted a "liberal approach" and employed a two-step process to determine whether the transaction was in the public interest. Id. at 54. First, the Commission considered whether under Section 5(2) of the Interstate Commerce Act the transfer was Consistent with public interest. Second, after concluding what part, if any, of Waggoner's authority was transferable, the Commission determined whether there was a sufficient showing of Public convenience and necessity to warrant the conversion from contract to common carrier authority. In the second decision the Commission announced:
 
 
 10
 Upon consideration, we conclude (1) that Waggoner's operating rights . . . have been actively used and are, therefore, transferable in their entirety, and (2) that public convenience and necessity require operation by Ruan as a common carrier under such rights.
 
 
 11
 Petitioners, opposing carriers, thereafter sought review in this court of the final administrative order of the Commission.
 
 
 12
 Waggoner has been a contract carrier transporting a limited class of commodities at the call and demand of a limited number of shippers. Under such circumstances, we concur in the Commission's view that Waggoner's traffic abstract need not show service to every State within its authority during the test period, but only that the evidence reflect a representative showing of authorized service. During the period from January 2, 1973, to March 19, 1974. Waggoner handled 538 shipments of chemicals, in bulk, destined to 18 states, under its base and Sub.-No. 5 permits. In our opinion, based on the nature of the commodities transported and the type of service authorized, Waggoner has made the requisite representative showing that its authority under its base and Sub.-No. 5 permits was not dormant in whole or in part. A public interest determination includes consideration of whether or not the authority has been actively used. To determine dormancy the Commission in the exercise of its expertise applies a flexible standard so as to be able to assess the facts peculiar to individual cases. Central Transport, Inc. Purchase (Portion) Piedmont Petroleum Products, Inc., 127 M.C.C. 1, 10 (1977); New Dixie Lines, Inc. Control Jocie Motor Lines, Inc., 75 M.C.C. 659 (1958).[1]
 
 
 13
 We recently considered this issue in Hilt Truck Line, Inc. v. United States, 548 F.2d 214, 215-6 (1977) (per curiam), where we enunciated the rationale, the definition and the requirements of a finding of dormancy:
 
 
 14
 In a long series of cases, the Commission has consistently held that harm to protesting carriers is a necessary prerequisite to a finding of dormancy. As early as 1958, it held that the concept of dormancy was formulated to protect "other carriers which have been required to expand their carrier facilities in order to take up the vacuum" created by the loss of service of the dormant authority. King's Van & Storage, Inc. Pur. Millard, 75 M.C.C. 582, 585 (1958). This concept was approved in Arrow Transportation Co. v. United States, 300 F.Supp. 813 (D.C.R.I.1969), where dormancy was defined as "an abandonment or termination of services the reactivation of which will result in damages either to the public interest or to intervening or protesting carriers who conducted operations during the interruption of said services." At 818. This definition has been accepted by the Commission and applied in numerous cases. Holme Freight Lines, Inc. Control, 116 M.C.C. 874, 880 (1975); Roadway Exp. Inc. Control and Merger Atlas, 122 M.C.C. 333, 335 (1976). Under these cases, the Commission must find that: (1) there has been an abandonment or termination of services; and (2) the reactivation of service will damage either the public interest or protesting carriers who conducted operations during the interruption of service. . . . The burden is on the protestant to establish the manner in which it would be injured, the particular traffic it would lose as the result of reactivation or other harm that would ensue. Roadway Exp. Inc. Control and Merger Atlas, supra, at 338.
 
 
 15
 Having concluded that Waggoner's contract authority is not dormant the applicants must next demonstrate a public need for conversion from contract to common carrier authority. A liberal approach is sanctioned when the proposed conversion of contract authority is directly related to a transfer. It has been recognized that carriers prosecuting conversion applications have certain equities in their favor, particularly where the commodities or territory, or both, are limited in scope, and the effects of the proposed change in status are likewise limited. Ruan Transport Corp. Purchase James A. Hannah, Inc., 70 M.C.C. 694, 696 (1957).
 
 
 16
 The Commission in evaluating the evidence on this issue stated:
 
 
 17
 With regard to Waggoner's past service, it is clear that the vendor's operations have been continuous and substantial. In addition, there is no doubt that while vendor's past operations under contract rights are specialized, such operations are adaptable to common carriage, as indicated by protestants' rendering of a similar service under common carrier authority. Finally, the public support is sufficient under the liberal approach to support the applicant's burden of proof. In this regard, we agree with the Administrative Law Judge in his initial decision when he said the following:
 
 
 18
 The shippers expressed their need for a continuance of such service, whether common or contract. The argument that public convenience and necessity has not been established ignores the evidence which shows that shippers will have a continuing need in the future . . . Such conversion would have little material effect on the existing competitive situation, but would have the salutary effect of eliminating all question of dual operations and the public discriminatory practices that flow therefrom.
 
 
 19
 127 M.C.C. at 55-56. Therefore the Commission reversed itself and included the 12 destination states in Waggoner's base and Sub.-No. 5 permits in Ruan's grant of authority stating the findings of the prior report were "predicated upon an incorrect application of the required standards of proof in the conversion proceeding." Id. at 57. Saying that the restriction on the Sub.-No. 5 permit which permitted transportation service only for Monsanto Chemical Co. was "inconsistent with a common carrier's obligation to serve the general public," the Commission lifted the restriction. Id. "That a conversion from contract to common authority necessarily results in an expanded service has been recognized by Congress, the courts, and this Commission." Id. Thus with Waggoner's base permit intact, the Sub.-No. 5 permit expanded from one customer to any number of customers, and the Sub.-No. 6 permit eliminated, Ruan was granted a certificate of public convenience and necessity.
 
 
 20
 Petitioners also complain that the Commission's decision will divert "substantial volumes" of their shipping in the 12-state area to competitor Ruan. The record does not substantiate that charge. Finding "public support . . . sufficient under the liberal approach to support the applicants' burden of proof," the Commission agreed with the Administrative Law Judge who said, "The shippers expressed their need for a continuance of such service . . . . (S)hippers will have a continuing need in the future. . . . Such conversion would have little material effect on the existing competitive situations."
 
 
 21
 Unable to cite substantial evidence in the record or legal authority to bolster their claim, the petitioners failed to carry their burden of demonstrating "the particular traffic" they would lose as a result of the transfer of authority to Ruan. Hilt Truck Line, Inc. v. United States, 548 F.2d at 215. The record establishes, furthermore, that none of Ruan's three competitors would be significantly affected. Petitioner-competitor Rogers Cartage Co. shipped only 38 loads out of 323 to the 30-state territory, or 11.8 per cent of the total, and made no shipments to seven of the 12 states. Petitioner-competitor Slay Transportation Co., Inc., transported 563 loads out of a total 6,556 shipments, or 8.6 per cent of the total, and had no movement in three of the 12 states. Petitioner-competitor Klipsch Hauling Co. shipped 38 loads out of a total of 339, or 11.2 per cent of the total, and made no shipments to seven of the 12 states.
 
 
 22
 The reasoning in Wilson Freight Forwarding Co. Control and Merger, 104 M.C.C. 83 (1967), is applicable although the factual situations are not identical;
 
 
 23
 Protestants generally are apprehensive that if the proposed transaction is approved and consummated, they would lose some of their traffic to Wilson. The extent to which these carriers claim that their operations would be affected is speculative and conjectural, and, in the absence of a showing with some particularity how much traffic they would lose or to what degree their operations would be harmed, their apprehensions may hardly be dispositive of the issues here presented. True, the transaction will probably cause some readjustments in competitive relations of carriers and an intensification of competition between points in Freight's territory. But this almost always occurs, to a greater or lesser degree, when the purchasing carrier is stronger financially than the selling carrier. In the light of the evidence showing that Campbell and Jones are well established, that they have been competing successfully against other carriers, that they have continued to grow and they have been receiving substantially more interline traffic from Freight, protestants' contentions that they would be adversely affected if the proposed transaction is consummated are not convincing especially in the absence of a showing that an impairment of their present service is likely to occur. Under all the circumstances presented, we are of the opinion that the proposed transaction would be consistent with the public interest.
 
 
 24
 We agree with the assessment of the Administrative Law Judge:
 
 
 25
 Protestants may, as in Wilson, supra, suffer some diversion of traffic, but this must be recognized as a necessary concomitant of a sale. They have not shown how they will be harmed by the granting of this application, or that the public interest will not be furthered by approval of both applications. Protestants are active carriers that have continued to grow, and there is little doubt that they will continue to grow in the face of the Ruan competition.
 
 It is well established that:
 
 26
 * * * existing carriers have no absolute immunity against future competition. Even where the competition resulting from a newly authorized service will cause a carrier already providing service to lose revenue, the issuance of new authority may best serve the public convenience and necessity. Kaylor and Stuart Extension Copperhill, Tenn., 124 M.C.C. 441, 446 (1976).
 
 
 27
 The petitioners argue, finally, that the Commission was inconsistent in finding that the Sub.-No. 5 permit was active but that the Sub.-No. 6 permit authorizing the transportation of pentachlorophenol for two named shippers to points in 20 states, was dormant. They rest that argument on two claims: the 20 states authorized under the Sub.-No. 6 permit overlap with the 30 states of the base and Sub.-No. 5 permits. Their first claim is correct, but the assertion fails because the second claim is incorrect. Pentachlorophenol, described by two chemical dictionaries as "white powder or crystals" and "gray flakes with phenolic odor," is not a liquid chemical and is transportable in its natural state.[2] Therefore there was no actual overlap between the permits. Further, since there was no evidence in the record of Waggoner transporting any pentachlorophenol, the Commission accurately found that the Sub.-No. 6 permit was dormant.
 
 
 28
 We recognize the broad discretion which the Commission has in determining what is consistent with the public interest. Interstate Commerce Commission v. Parker, 326 U.S. 60, 65, 65 S.Ct. 1490, 89 L.Ed. 2051 (1945); McLean Trucking Co. v. United States, 321 U.S. 67, 76, 64 S.Ct. 370, 88 L.Ed. 544 (1944). In our view the Commission acted within its statutory authority upon adequate findings supported by substantial evidence.
 
 
 29
 The orders of the Commission are affirmed.
 
 
 30
 AFFIRMED.
 
 
 
 *
 The Honorable William G. East, Senior United States District Judge for the District of Oregon, is sitting by designation
 
 
 [1]
 Under the liberal approach adopted in Central Transport, supra, even dormant operation authority may be transferred under some circumstances
 
 
 [2]
 Described respectively in Condensed Chemical Dictionary, 9th ed. 1977, Van Nostrand Reinhold Co.; Hackh's Chemical Dictionary, 4th ed. 1969, McGraw-Hill Book Co