BARRETT MOBILE HOME TRANS-
PORT, INC., Plaintiff,

v.

UNITED STATES of America and Inter-
state Commerce Commission,
Defendants,

and

Morgan Drive Away, Inc., et al.,
Intervening Defendants.

No. 4–71 Civil 627.

United States District Court,
D. Minnesota,
Fourth Division.

Sept. 5, 1973.

Mackall, Crounse & Moore, by Clay R. Moore and Frank A. Dvorak, Minneapolis, Minn., Rea, Cross & Knebel, by Donald E. Cross, Washington, D.C., and McLaughlin & Stearns, by John G. McLaughlin, Portland, Or., for plaintiff.

Fritz R. Kahn, Gen. Counsel, and Seymour Glanzer, Atty., Interstate Commerce Commission, Washington, D.C., for defendant Interstate Commerce Commission.

Robins, Davis & Lyons, by Sidney S. Feinberg, Minneapolis, Minn., and Singer & Lippman, by William Lippman, Washington, D.C., for intervening defendant Morgan Drive Away, Inc.

Robins, Davis & Lyons, by Sidney S. Feinberg, Minneapolis, Minn., Grove, Jaskiewicz & Gilliam, by Leonard A. Jaskiewicz and Ira G. Megdal, Washington, D.C., and Richard O. Battles and Fred Rahal, Jr., Tulsa, Okl., for intervening defendant National Trailer Convoy, Inc.

Robins, Davis & Lyons, by Sidney S. Feinberg, Minneapolis, Minn., Ames, Hill & Ames, by Wilmer B. Hill, Washington, D.C., and Mitchell King, Jr., Greenville, S.C., for intervening defendant Transit Homes, Inc.

## OPINION

Before HEANEY, Circuit Judge, DEVITT, Chief District Judge, and LORD, District Judge.

MILES W. LORD, District Judge:

This matter is before the Court pursuant to 28 U.S.C. §§ 1336, 1398 and 2321–2324. A three judge district court was formed pursuant to 28 U.S.C. §§ 2284 and 2325.

Plaintiff Barrett Mobile Home Transport, Inc. seeks to permanently enjoin

and set aside certain orders of the defendant Interstate Commerce Commission which denied, in whole or in part, three applications by Barrett under Section 207 of the Interstate Commerce Act, 49 U.S.C. § 307.[1] The applications sought certificates of public convenience and necessity to extend operations in interstate or foreign commerce as a motor common carrier of various mobile structures. Barrett seeks such relief on the grounds that the ICC's orders "are arbitrary and capricious, not in accord with the standards, provisions, and policies of the Interstate Commerce Act . . . and the Administrative Procedure Act . . . are lacking in rational explanation, and deprive [Barrett] of its property without due process of law . . . ."

Defendant United States of America neither admits nor denies Barrett's allegations and neither supports nor opposes the orders of the ICC. The ICC asserts that it acted legally, rationally, and within its discretion in concluding that Barrett's proposed services are not required by the present or future public convenience and necessity, and that the relief sought by Barrett should be denied and Barrett's complaint dismissed. Intervening defendants Morgan Drive Away, Inc. and National Trailer Convoy, Inc. support the position of the ICC. Intervening defendant Transit Homes, Inc. supports the position of the ICC as to two of its orders,[2] but takes no position as to the third.

### Findings of Fact

*The Parties.* Barrett is a Minnesota corporation with its principal place of business at Moorhead, Minnesota. It is a common carrier by motor vehicle engaged in interstate and foreign commerce in the transportation of specified commodities pursuant to authority issued to it by the ICC.

Morgan, National and Transit are common carriers by motor vehicle engaged in interstate commerce in the transportation of specified commodities pursuant to authority issued to them by the ICC. Morgan has its principal place of business at Elkhart, Indiana, National at Tulsa, Oklahoma and Transit at Greenville, South Carolina.

*Sub-No. 31 and Sub-No. 35 Proceedings.* On August 19, 1965, Barrett filed applications with the ICC seeking authority to operate as a common carrier by motor vehicle over irregular routes transporting:

Buildings, complete or in sections travelling on their own or with removable undercarriages equipped with hitchball coupler:

*Sub-No. 31:*

From points in Washington, Oregon, California, Nevada, Idaho, Montana, Wyoming, Utah, Colorado, New Mexico, North Dakota, South Dakota, and Alaska, to points in the United States, including points in Alaska (but excluding Hawaii).

*Sub-No. 35:*

Between points in Arizona, on the one hand, and, on the other, points in the United States, including Alaska (but excluding Hawaii).

Barrett's applications were noticed in the Federal Register and were protested by Morgan, National and Transit on the grounds that the authority sought by Barrett conflicted with the existing authority of the protestants to transport singlewides and doublewides[3] in certain western states. Transit subsequently withdrew its objections and ultimately processed seven of its own applications on a consolidated record with Barrett's Sub-Nos. 31 and 35 applications.

Extensive hearings were had on all of these applications before Examiner Wil-

---

1. The applications of Barrett referred to are its Sub-Nos. 31, 35, and 85 applications which are discussed in detail *infra* at pp. 1320–1323.

2. The ICC's orders on Barrett's Sub-Nos. 31 and 35 applications.

3. The terms "singlewides" and "doublewides" are explained at p. 1325 *infra*.

liam B. Culbertson beginning on July 17, 1967 and ending in February, 1968. The Examiner's Report and Order was served on the parties on August 26, 1969.

The Examiner concluded that the commodity description employed by Barrett in its applications embraced both singlewides and doublewides. Based on that conclusion and upon consideration of the evidence as to public need for the transportation of singlewides and doublewides, the Examiner recommended that Barrett be granted authority to transport both in initial movements, over a smaller geographical area than applied for, and in secondary movements, over the same geographical area as applied for. Morgan, National and Transit all filed exceptions, Barrett replied and the matter was referred to the ICC's Division 1, a panel composed of three members of the ICC, for determination.

Division 1 entered its decision on November 13, 1970 in Transit Homes, Inc., Extension—Buildings (Idaho), 112 M.C.C. 422 (1970). Division 1 found the Examiner's statement of facts to be correct in all material respects and, with a few additions, adopted that statement as its own. The Division drew different conclusions than the Examiner however, and it severely reduced the Examiner's suggested grant of authority to Barrett by refusing to grant Barrett authority to transport singlewides and only limited authority to transport doublewides.

On the question of whether or not the Examiner had correctly considered evidence of and found a public need for the transportation of singlewides and doublewides, Division 1 said:

> At some points the examiner recommended the granting of both doublewide and mobile home authority—authority broader than requested—apparently in the belief that the two authorities are not mutually exclusive. However, the Commission in Mobile Homes Between Points in the United States, 337 I.C.C. 111, found that the

descriptions "buildings, complete, knocked down or in sections," and "trailers designed to be drawn by passenger vehicles" are mutually exclusive, and evidence of a need for authority to transport the one does not of necessity justify a grant of authority to transport the other. By the same token, no consideration has been given to the issuance of authority, even though within the scope of the applications, unless there has been demonstrated specific evidence of past or future need by either the supporting dealers or manufacturers. 112 M.C.C. at 432.

On March 15, 1971, Barrett filed a petition for reconsideration and the intervening defendants replied on June 7, 1971. Barrett contended that Division 1 erred in reversing the Examiner's consideration of the evidence of a public need for the transportation of singlewides and in reversing the Examiner's suggested grant of authority to transport singlewides. Barrett's position was that in view of Pre-Fab I,[4] evidence of a public need for singlewide transportation had been properly received in evidence and considered by the Examiner. The intervening defendants asserted that the Division had acted correctly. In an order entered on July 14, 1971, Division 1, after making corrections in its earlier decision not here pertinent, denied Barrett's petition for reconsideration, stating that:

> It is further ordered, That in all other respects the above-noted petitions for reconsideration of the applicants and the protestants be, and they are hereby, denied, for the reasons (1) that the findings of division 1, in its report and order entered herein on November 13, 1970, reported at 112 M.C.C. 422, as modified by this order, are in accordance with the evidence and the applicable law . . .

Barrett responded by filing a petition for reconsideration of the July 14, 1971 order again asserting that the Division

---

4. *See,* discussion in text at pp. 1325–1326 *infra.*

should have considered the evidence of public need for the transportation of singlewides and should have granted such authority to the same extent as recommended by the Examiner. The intervening defendants again maintained that the Division acted properly. Division 1 denied Barrett's petition on November 30, 1971 stating that:

> [T]he petition . . . is . . . denied, for the reasons that the findings of Division 1, acting as an Appellate Division, in its order entered herein on July 14, 1971, which considered, *inter alia*, whether the evidence of record also demonstrated a need for applicant's service in the transportation of trailers designed to be drawn by passenger automobiles, and determined that a need for such service had not been established, are in accordance with the evidence and the applicable law . . . .

There is a dispute between the parties as to whether Division 1 considered the evidence of a public need for the transportation of singlewides in making its decision of November 13, 1970. Barrett contends that the Division did not do so because it found that Barrett had not applied for singlewide authority. The defendants assert that although the Division found that Barrett had not applied for singlewide authority [5] it still considered the evidence on singlewides substantively and found it wanting.

It is clear that Division 1 did review the evidence as to singlewides in regard to Barrett's Sub-Nos. 31 and 35 applications in addition to Barrett's Sub-No. 23 application.[6] However after careful consideration, the Court concludes that the Division did not consider such evidence substantively based on its findings that the singlewide and doublewide commodity descriptions are mutually exclusive [7] and that Barrett had applied for singlewide authority only in its Sub-No. 23 application.[8] In addition, the Division's statement in its order of November 30, 1971 that it had considered such evidence in entering the July 14, 1971 order indicates that that evidence had not been considered earlier.

*Sub-No. 85 Proceedings.* On October 10, 1968, Barrett filed its Sub-No. 85 application seeking permanent authority for the transportation of trailers designed to be drawn by passenger automobiles (singlewides) and sectional buildings (doublewides), in initial movements, from points in Idaho to points in the United States, excluding Hawaii. The application was protested by Morgan and National, and hearings on it were held before Examiner Joseph A. Reilly in May 1969 and February 1970. At the hearings, extensive evidence was

5. Division 1 stated that:
 As indicated, only Barrett in its Sub-No. 23 application seeks authority to transport mobile homes [i.e., singlewides]. 112 M.C.C. at 431.

6. For instance, at one point in its Report, Division 1 stated that:
 We are persuaded that the collective evidence of record demonstrates that a need exists for the proposed services to the extent set forth in our findings. The 27 supporting manufacturers ship an average of 19 mobile homes and double-wides a week. This amounts to more than 26,000 units a year. The 52 supporting dealers sell an average of 4 units each week or about 10,000 units a year. While there undoubtedly is some overlap between the manufacturers' production and the dealers' sales, it is apparent that the supporting witnesses produce or sell an impressive number of units each year. Moreover, the production and sales of double-wides have been increasing rapidly and, based on this record, there is every reason to believe that they will continue to do so. True, much of this traffic has moved intrastate or in private rather than for-hire carriage. But substantial portions of that traffic have also moved interstate in for-hire carriage. And, given the huge number of shipments involved, the rapid expansion in the housetrailer and sectionalized building industries, and the fact that each unit must be drawn by a single tractor, we are convinced that additional service is warranted with respect to the commodities and territories involved to the extent specified in our findings. 112 M.C.C. at 430.
 *See also*, Appendix E to Division 1's Report, 112 M.C.C. at 442–464.

7. *See*, quote at p. 1321 *supra*.

8. *See*, note 5 *supra*.

presented by Barrett, including evidence on the transportation services it had provided from Boise, Idaho in 1968 and 1969 pursuant to its Sub-No. 81TA temporary authority discussed below. Morgan and National also presented extensive evidence.

The Examiner denied Barrett's application in a Report and Order of October 6, 1970. He based his denial on three major factors: "the operations of [Barrett] under its temporary authority have had a destructive and adverse effect on existing carriers," "[Barrett has] not established on this record inadequacy of service by the existing carriers," and "[Barrett] adduced no compelling evidence of an upsurge in traffic beyond the capabilities of the protestants to handle adequately and efficiently." [9]

Exceptions to the Examiner's Report were filed by Barrett and the protestants replied. In its decision of January 15, 1971, Review Board No. 3 of the ICC adopted the Examiner's findings and denied Barrett's application. Barrett then petitioned for reconsideration, but that petition was denied by Division 1 on September 3, 1971.

*Sub-No. 81TA Proceedings.* Meanwhile, in early 1968, Barrett had filed its Sub-No. 81TA application for temporary authority, pursuant to 49 U.S.C. § 310a(a), to transport trailers designed to be drawn by passenger automobiles and sectional buildings, in initial movements, from Boise, Idaho to seven western states. On August 14, 1968, the Sub-No. 81TA application was granted over the opposition of Morgan and National for a period of 180 days. Such grant of authority could only have been based on a finding that there was an immediate and urgent need for the service and that there was no other common carrier capable of meeting that need. [10]

Barrett instituted its temporary service from Boise in the summer of 1968. On January 13, 1969, the ICC notified Barrett that it could continue to operate under its Sub-No. 81TA temporary authority until the corresponding permanent application, the Sub-No. 31 application, was finally determined. Morgan and National challenged that ruling contending that Barrett's Sub-No. 81TA authority corresponded to its Sub-No. 85 application and that when the latter was finally denied on September 3, 1971, Barrett's right to its temporary authority terminated. The ICC affirmed its prior ruling on September 30, 1971, and Morgan and National filed two actions in the United States District Court for the Northern District of Indiana, one seeking to have the ICC's September 30, 1971 ruling set aside, the other, by mandamus, to compel the ICC to rescind the ruling. The Indiana Court denied subsequent motions for a temporary restraining order in the first case and deferred ruling on the mandamus complaint. Thereafter, on December 8, 1971, the ICC moved the Court to dismiss the actions on the grounds that the issue was moot in view of the ICC's final denial of Barrett's Sub-Nos. 31 and 35 applications on November 31, 1971 and that the ICC properly found that Barrett could continue to operate under its temporary authority pending the final decision on its corresponding permanent application. Apparently, this motion is still pending.

*The Present Action.* Barrett filed this action on December 8, 1971, and, on the same day, filed a motion for a temporary restraining order providing that its temporary authority be continued pending final adjudication of the action. A temporary restraining order to such effect was entered on December 9, 1971 by Judge Larson and that order is still in effect.

### Judicial Review of ICC Decisions

The parties recognize the well-settled principle of law that the scope of judicial review of the decisions of an administrative agency like the ICC is limited. [11] The decisions of such an

9. *See,* the Examiner's Report and Order at pp. 13–15.

10. *See,* 49 U.S.C. § 310a(a).

11. *See, e.g.,* the ICC's Brief at pages 14–17 and Barrett's Brief at pages 20–22.

agency must be sustained by the reviewing Court if they are within the agency's statutory powers and are based on appropriate findings which, in turn, taking the record as a whole, are supported by substantial evidence, with the caveat that the Court must judge the propriety of the administrative action solely on the grounds invoked by the agency.[12] As to the latter point, the Supreme Court, in Securities and Exchange Commission v. Chenery Corp., note 12 *supra*, stated that:

> [A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. 332 U.S. at 196, 67 S.Ct. at 1577.

### Conclusions of Law

*Sub-No. 31 and Sub-No. 35 Proceedings*. Barrett asks that the ICC's orders denying in part its Sub-Nos. 31 and 35 applications be enjoined, set aside and annulled and the applications remanded to the ICC for further action on the grounds that the record fails to disclose the grounds upon which the ICC reversed its position on considering the evidence of a need to transport singlewides, that the ICC's conclusion that a need for singlewide service had not been established is without a rational basis, is lacking in requisite subsidiary findings and is not supported by substantial evidence and that the foregoing destroys the validity of its findings and conclusions as to the grants of doublewide authority.

The ICC contends that the record discloses that it considered the evidence concerning singlewides throughout the proceedings, that it properly found that a need for singlewide service had not been established and that its findings in regard to doublewides are valid. The intervening defendants contend that the ICC need not have and should not have considered evidence on singlewides because Barrett did not seek such authority. However, all the intervening defendants at least tacitly agree that the ICC can consider evidence on matters outside the authority sought and can grant authority greater than that sought if such evidence warrants it.[13] In any event, they all assert that the ICC did consider the evidence on singlewides at all stages of the proceedings and that it properly found that a need for singlewide authority had not been established.

*(i) The Singlewide/Doublewide Controversy.* As suggested above, there

12. *See*, Sections 8(b) and 10(e) of the Administrative Procedure Act, 5 U.S.C. §§ 557(c), (A) and 706(2)(E); Consolo v. Federal Maritime Commission, 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966); Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); Interstate Commerce Commission v. J–T Transport Co., 368 U.S. 81, 82 S.Ct. 204, 7 L.Ed.2d 147 (1961); Universal Camera Corp. v. Labor Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Securities and Exchange Commission v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); United States v. Pierce Auto Freight Lines, 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821 (1945); United States v. Carolina Carriers, 315 U.S. 475, 62 S.Ct. 722, 86 L.Ed. 971 (1942); Phelps Dodge Corp. v. Labor Board, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed.

1271 (1941); Atchison, Topeka and Santa Fe Ry. v. United States, 334 F.Supp. 651 (D.C.Minn.1971); Pre-Fab Transit Co. v. United States, 262 F.Supp. 1009 (S.D.Ill. 1967); Great Northern Ry. Co. v. United States, 209 F.Supp. 230 (D.C.Minn.1962); 2 K. Davis, Administrative Law Treatise, § 16.12 (1958).

13. Transit states in its Brief, at page 15, that:

> We recognize that the Commission is empowered to grant authority in excess of that sought if there is some basis on the record for it.

National states in its Brief at pages 28–29 that in considering such evidence the ICC granted Barrett a "windfall" but it does not challenge the ICC's power to do so. Morgan takes a similar position in its Brief.

has been a controversy over the meaning of the "singlewide" and "doublewide" commodity descriptions. Section 206(a)(1) of the Act, 49 U.S.C. § 306 (a)(1), provides that:

> [N]o common carrier by motor vehicle . . . shall engage in any interstate or foreign operations . . . unless there is in force with respect to such carrier a certificate of public convenience and necessity issued by the Commission authorizing such operations.

Such certificates specify the service to be rendered, including the commodities to be transported, as well as the routes, territories and termini authorized to be served. Thus, the commodity description contained in a certificate is important in determining the nature and extent of a carrier's authority.

Commodity descriptions usually cause little or no conflict, but at times they must be interpreted by the ICC in order to determine the breadth of certain authorizations. Such an interpretive problem arose in the early 1960's over commodity descriptions authorizing the transportation of "trailers designed to be drawn by automobiles" or "mobile homes" (singlewides) and "prefabricated buildings, complete, knocked down, or in sections" or "sectional buildings" (doublewides).

The issues involved were whether the "singlewide" commodity description included doublewides, and whether the "doublewide" commodity description included singlewides. These issues were finally decided only after years of litigation of two separate ICC proceedings.

In the first of these proceedings, National Trailer Convoy, Inc. Extension—Portable Buildings, 91 M.C.C. 301 (1962), the ICC decided that the authority to transport singlewides did not in-

clude the authority to transport doublewides. The Supreme Court affirmed that decision.[14]

The second of these proceedings, dealing with the issue of whether the authority to transport doublewides included the authority to transport singlewides, was more protracted. The issue came to a head on March 2, 1966 when the ICC's Rates and Practices Review Board found that doublewide authority did not include singlewide authority. That finding was challenged in an action before a three judge district court in Pre-Fab Transit Co. v. United States, note 12 *supra (Pre-Fab I)*. The Court held that the ICC's order, based on the finding discussed above, was clearly erroneous, and it therefore annulled and set aside that order with leave to the ICC to take further appropriate action. The Court made it clear that it felt that, based on the evidence presented to the ICC by the plaintiff, the doublewide commodity description embraced and included singlewides and that authority to transport doublewides included authority to transport singlewides.

The ICC held further hearings and, after a more thorough consideration of the issue, reaffirmed its previous decision that doublewide authority did not include singlewide authority in Mobile Homes Between Points in the United States, 337 I.C.C. 111 (1970). An appeal followed, and in Pre-Fab Transit Co. v. United States, 321 F.Supp. 1147 (S.D.Ill.1971), *(Pre-Fab II)*, a three judge district court, with one judge dissenting,[15] affirmed the decision upon concluding that the ICC's findings were supported by substantial evidence.

■ *Pre-Fab II* made it clear that the singlewide and doublewide commodity descriptions were mutually exclusive. However, from the early 1960's until

14. The ICC's decision was first affirmed by a three judge district court in National Trailer Convoy, Inc. v. United States, 240 F.Supp. 286 (M.D.Okl.1965), and then by the Supreme Court in a per curiam opinion, 382 U.S. 40, 86 S.Ct. 161, 15 L.Ed.2d 33 (1965).

15. Two of the judges on the *Pre-Fab II* panel has also been on the *Pre-Fab I* panel, and one of them, Chief District Judge Poos, was the dissenter.

*Pre-Fab II* was decided, there was uncertainty as to whether doublewide authority included singlewide authority, or, as in the present case, whether an application for doublewide authority was also an application for singlewide authority.

■ *(ii) The Court's Conclusions.* In view of the confused state of the law discussed above, the fact that the ICC has the power to grant authority in excess of that sought[16] and the evidence presented to the Examiner by Barrett and Transit,[17] the Court must conclude that the ICC is correct in taking the position that consideration was properly given to granting Barrett singlewide authority. The defendants contend that the ICC "unquestioningly considered evidence of singlewides, substantively, at all stages of the proceedings,"[18] but the Court has found that, at least as to the decision of November 13, 1970, this is not so.[19] As to the other stages of the proceedings,[20] the Court has only the bald statement in the order of November 30, 1971 that the ICC had, in making its order of July 14, 1971, considered the evidence as to singlewides and determined that no need for such service had been established.[21] Assuming, without deciding, that such consideration was given, the Court must still set aside the ICC's orders in this regard because it failed to set forth the grounds on which its determination was made.

■ It is true that the ICC reviewed the evidence submitted, including the evidence as to singlewides, in its November 13, 1970 decision.[22] However, neither that decision nor the two orders that followed contained any findings laying a basis for the conclusion that a grant of singlewide authority was not justified by such evidence. Since no such findings were made and since the Court cannot affirm an administrative action by providing what the Court might consider to be an adequate or proper basis,[23] that part of the ICC's orders denying Barrett singlewide authority on its Sub-No. 31 and 35 applications must be set aside and the matter remanded for reconsideration consistent with this Opinion and Order. In this reconsideration, the ICC should take additional evidence to determine if the situation has changed since 1968 when the last evidence was taken.

As to its contention that the ICC's failure to make proper findings on the need for singlewide service destroys the validity of the grant of doublewide authority, Barrett asserts that there is such a high degree of interaction and interplay in the public need for singlewide and doublewide transportation that the ICC's "fragmented" grant of doublewide authority is of "suspected validity" and, as a result, further asserts that the doublewide aspects of its applications should also be remanded to the ICC.

■ It is certainly true that singlewides and doublewides are closely related commodities and that the public need for their transportation is also closely related.[24] However, it does not

---

16. *See,* discussion in text at page 10 and note 13 *supra.*

17. That evidence is summarized in Appendix E of Division 1's Report, 112 M.C.C. at 442–464.

18. ICC's Brief at page 18.

19. *See,* discussion in text at pages 1322 and 1323 *supra.*

20. That is, the orders of July 14, 1971 and November 30, 1971.

21. *See,* quote in text on page 1322 *supra.*

22. *See,* note 6 and accompanying text, *supra.*

23. *See,* discussion in text at pages 1323 and 1324 *supra.*

24. For instance, in Transit Homes, Inc. v. United States, 299 F.Supp. 950, 954–955 (D.C.S.C.1969), the Court summarized the Examiner's findings as to the relation between singlewides and doublewides as follows:

 [D]ouble wides are manufactured principally by the manufacturers of single wides . . . that double wides are sold by dealers who sell single wides, that they are placed in mobile home parks that serve both single and double wides, that the frame and undercarriages are the

follow that a failure to enter proper findings as to singlewides destroys, in and of itself, the validity of a grant of doublewide authority based on sufficient findings. Since Barrett has not attacked the validity of the ICC's findings as to doublewides *per se,* perhaps it should be presumed that they are valid. In any event, the Court concludes that such findings are appropriate, are supported by substantial evidence and, hence, are valid.

Therefore, the Court will not set aside the ICC's findings as to the doublewides or the authority granted to Barrett as a result of such findings. However, this ruling by the Court does not preclude the ICC from granting Barrett additional doublewide authority if, on remand, it decides that Barrett should be granted singlewide authority and that under its "field of service doctrine"[25] Barrett should be granted corresponding doublewide authority.

*The Sub-No. 85 Proceeding.* Barrett asks that the ICC's orders denying its Sub-No. 85 application be enjoined, set aside and annulled and the applications remanded to the ICC for further action on the grounds that the ICC applied improper evidentiary standards in judging the weight to be accorded operations conducted by Barrett under its Sub-No. 81TA temporary authority, that it failed to consider such operations in conjunction with other evidence of a need for the service and that its conclusion that such operations were destructive of Morgan and National is without a rational basis and is not supported by substantial evidence. The ICC, Morgan and National contend that the ICC applied the proper legal standard in determining whether the public convenience and necessity required the operations proposed by Barrett, that its conclusion that Barrett's temporary operations were destructive of competition is warranted by the facts and law and that its conclusions are supported by substantial evidence.

As to its contentions that the ICC applied improper evidentiary standards in judging the weight to be accorded its temporary operations and that it wrongfully failed to consider such operations in conjunction with other evidence of a need for the proposed service, Barrett asserts that the ICC wrongfully considered such operations *"solely* as to their competitive effect on the operations of [Morgan and National]."[26] Barrett further asserts that this resulted from the ICC erroneously considering Barrett's temporary operations under the "consistent with the public interest" test of Section 5 of the Act, 49 U.S.C. § 5, rather than the "public convenience and necessity" test of Section 207 of the Act, 49 U.S.C. § 307.

It is true that temporary operations under 49 U.S.C. § 310a(a)[27] are to be considered under the "public convenience and necessity" test while temporary operations under 49 U.S.C. § 310a(b) are to be considered under the "consistent

---

same for both, that both normally utilize a hitch-ball latch for connecting to the hitch-ball on the towing vehicle, that both are equipped by manufacturers with household furniture and kitchen appliances and fixtures and lavatory fixtures, that both are used for living quarters, as well as other industrial and professional uses, that under carriages are normally left on each of the double wide units, and overall that manufacturers, dealers and mobile home park operators treat double wide units in the same manner as a single unit mobile home or trailer.

25. This doctrine has been discussed and applied in numerous cases. *See, e.g.,* Transit

Homes, Inc. v. United States, note 23 *supra;* Pennsylvania-Ohio Express, Inc. Extension—Refractory Products, 96 M.C.C. 499 (1964); U.S.A.C. Transport, Inc. Extension—Missiles, 103 M.C.C. 23 (1966); Denny Motor Freight, Inc. Extension—Tractors from Louisville, Ky., 103 M.C.C. 626 (1967); Morgen Drive-Away, Inc., Extension—Double-Wides, 105 M.C.C. 380 (1967); Fox-Smythe Transportation Co. Extension—Oklahoma, 106 M.C.C. 1 (1967); Transit Homes, Inc. Extension—Michigan, 107 M.C.C. 445 (1968).

26. Barrett's Brief at p. 35.

27. Barrett's Sub-No. 81TA temporary authority was granted under this section.

with the public interest" test. The former test was enunciated by the ICC in Pan-American Bus Lines Operation, 1 M.C.C. 190 (1936):

> The question in substance, is whether the new operation or service will serve a useful public purpose, responsive to a public demand or need; whether this purpose can and will be served as well by existing lines or carriers; and whether it can be served by applicant with the new operation or service proposed without endangering or impairing the operations of existing carriers contrary to the public interest. 1 M. C.C. at 203.

The latter test was explained by the Supreme Court in McLean Trucking Co. v. United States, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944) as follows:

> In short, the Commission must estimate the scope and appraise the effects of the curtailment of competition which will result from the proposed consolidation and consider them along with the advantages of improved service, safer operation, lower costs, etc., to determine whether the consolidation will assist in effectuating the over-all transportation policy. 321 U. S. at 87, 64 S.Ct. at 381.

 It is thus clear that the factors to be considered under the two tests are quite different. In the case of the "public convenience and necessity" test, the ICC must consider three factors: whether there is a public demand or need for the proposed operations, whether such demand or need can be served as well by existing carriers as by the applicant and whether the proposed operations will endanger or impair the operations of existing carriers (i. e., the competitive effect). In the case of the "consistent with the public interest" test, the ICC must consider the competitive effect of the proposed consolidation in conjunction with any benefits to the public of such consolidation. It is obvious that the "consistent with the pub-

lic interest" test places a far greater emphasis on competitive effect than does the "public convenience and necessity" test.

 After carefully considering the Examiner's Report and Order, as affirmed, the Court concludes that an incorrect evidentiary standard was applied as to Barrett's temporary operations in that there was a wrongful failure to consider such operations in conjunction with other evidence of a need for the proposed service. That is, the Court finds, as Barrett asserts, such temporary operations were wrongfully considered *"solely* as to their competitive effect on the operations of [Morgan and National]."

The Examiner set out the evidentiary standard as to Barrett's temporary operation as follows:

> The Commission has considered operations conducted under temporary authority with other evidence in determining whether the transaction would be consistent with the public interest, particularly when such operation offered a means of ascertaining whether the service thereunder has had or will have a destructive effect on the operations of established carriers. Askworth Transfer, Inc.,—Pur—Willcox & Foukes, 90 M.C.C. 107 [(1967)]. Examiner's Report and Order at p. 13.[28]

In so doing, the Court finds that the Examiner applied the wrong evidentiary standard in that the standard he set forth overemphasized the importance of the "competitive effect" of Barrett's temporary operations at the expense of other factors which should have been considered.

 It is clear that temporary operations under Section 210a(a) create no presumption that corresponding permanent authority should be granted, and, in fact, are alone insufficient to justify

---

**28.** Note that the case cited by the Examiner involved a Section 5 consolidation and not a Section 207 application for new authority.

a grant of permanent authority.[29] However, it is also clear that evidence as to temporary operations is of probative value as to certain issues involved in a decision whether or not to grant new authority. The ICC summarized its policy in this regard in Frank Wehe Common Carrier Application, 112 M.C.C. 315 (1970):

> Although operations under temporary authority raise no presumption of a need for corresponding permanent operations and are alone insufficient to justify a grant of authority . . . nevertheless, evidence of past operations under temporary authority is of probative value to support an application for permanent authority where it is used to determine the ability of a carrier to provide the service, where it indicates the volume of traffic involved and the effect of a grant of authority on existing carriers, and

where there is other evidence supporting the application. 112 M.C.C. at 320.

■ The ICC should have considered the evidence as to Barrett's temporary operations in conjunction with all the other evidence adduced in determining whether Barrett's proposed service would serve a useful public purpose by fulfilling a public demand or need, whether Barrett had the ability to provide its proposed service, whether the public purpose could and would be served as well by the existing carriers and what the volume of traffic involved was,[30] in addition to the effect of granting the proposed service on existing carriers' operations. This is especially true in view of the fact that in order to grant temporary authority under 49 U.S.C. § 310a(a) there must be a finding that there is an "immediate and urgent need" for such operations.[31]

---

**29.** *See*, 49 U.S.C. 310a(a) which provides, in part, that:

[Such temporary authority] shall create no presumption that corresponding permanent authority will be granted therefore.

*See also*, Mississippi East, Inc. v. United States, 301 F.Supp. 1332, 1338 (W.D.Pa. 1969); Caravelle Express Inc. v. United States, 287 F.Supp. 585, 587 (D.Neb.1968); C & H Transportation Co. v. United States, 249 F.Supp. 97. 100 (N.D.Texas 1965); Colorado—Arizona—California Express, Inc. v. United States, 224 F.Supp. 894 (D.C.Colo. 1963).

**30.** For instance, in regard to the last two factors, the ICC found that the service provided by the existing carriers had not been shown to be inadequate. *See*, Examiner's Report and Order at pp. 14–15. However, in making this finding no consideration was given to Barrett's temporary operations either to determine the volume of traffic or to determine whether Morgan and National could, in the absence of Barrett's operations, handle such traffic.

In discussing the "destructive effect" of Barrett's temporary operations on page 13 of his Report and Order, the Examiner made certain findings which would have been helpful in making the aforementioned determinations, but which were not discussed and apparently not considered in making the finding that the existing carriers' service had not been shown to be inadequate. That

is, the Examiner set forth the following table of units transported during the respective years from points in Idaho by Barrett, National and Morgan:

| Year | Barrett | National | Morgan |
|------|---------|----------|--------|
| 1968 | 425 | 2,329 | 1,200 |
| 1969 | 1,100 | 1,556 | 1,600 |

Thus, the total number of units transported from Idaho was 3,954 in 1968 and 4,256 in 1969, an increase of 302 units transported, or in percentage terms, an 8% increase. Although no findings were made as to 1967, it would be reasonable to assume that the total number of units transported in that year was less than the 3,954 transported in 1968.

The importance of these facts is that they indicate what the volume of traffic was and, in conjunction with evidence as to the capacity of Morgan and National, would indicate whether those two carriers could adequately fulfill the increased public need and demand in the absence of Barrett's temporary operations. This is the type of finding the Court would expect the ICC to make upon reconsideration.

**31.** 49 U.S.C. § 310a(a) provides, in part, that:

To enable the provision of service for which there is an immediate and urgent need to a point or points or within a territory having no carrier service capable of meeting such need, the Commission may,

As to its contentions that the ICC's conclusion that its temporary operations were "destructive" of Morgan and National is without rational basis and is not supported by substantial evidence, Barrett asserts that the adverse effects on Morgan and National from such operations did not amount to "destructive competition" and that, in any event, the ICC's findings on this point do not support the conclusion reached.

■ "Destructive competition" is a concept which apparently has never been explained in detail by the ICC or by any court. The ICC did set forth the general principle in Motor Service on Interstate Highways—Passengers, 110 M.C.C. 514 (1969):

> It is a fundamental duty of this Commission to protect the public from the damaging effects of ruinous or destructive competition among carriers, including deterioration in service resulting from the wasteful duplication of transportation service. . . .
> However, it is axiomatic that carriers first in business have no inherent right to be protected from merely new, as opposed to destructive, competiton, and this is so, more particularly where such new competition is in the public interest. 110 M.C.C. at 534–535.

In that case, the ICC also cited with approval a statement in Commercial Zones and Terminal Area, 54 M.C.C. 21 (1952) to the effect that destructive competition was competition "likely to be materially disabling to [a] carrier." [32] It is thus clear that the ICC has considered

destructive competition to be more than normal "hard" competition. Such competition has been found to be that which will be so harmful to other carriers as to reduce or destroy their ability to serve the public adequately.[33]

■ The ICC relied on the following facts in concluding that Barrett's temporary operations were "destructive" of Morgan and National: [34] Morgan had an increase in shipments from points in Idaho during 1969 over 1968 of 400 and National a decrease of 773, Morgan had 760 shipments originating at Boise in 1968 and 550 in 1969, National had 1,267 shipments originating at Boise in 1968 and 630 in 1969, Barrett had 425 shipments (all of which originated at Boise) in 1968 and 1,100 in 1969, Morgan had an increase in revenue of $118,000 on shipments from points in Idaho in 1969 over 1968 but it was assumed that Morgan suffered a loss of revenue on shipments originating at Boise because of the decrease in shipments from that point, and National had a decrease in profits on shipments from points in Idaho from $72,500 in 1968 to $485 in 1969. After carefully considering these facts, the Court concludes that they do not support the ICC's conclusion that Barrett's temporary operations were "destructive" of Morgan and National. That is, the Court finds that such conclusion by the ICC was not based on appropriate findings or supported by substantial evidence.

The facts relied on by the ICC [35] indicate, at most, that since Barrett began its temporary operations from Boise

---

in its discretion and without hearings or other proceedings, grant temporary authority for such service by a common carrier or a contract carrier by motor vehicle, as the case may be.

32. 54 M.C.C. at 84.

33. *See*, in addition to the cases cited in the text, Chandler Trailer Convoy, Inc.—Extension—49 States, 114 M.C.C. 436, 445 (1971).
 The ICC's use of the term coincides with that of courts in other contexts. For instance, in Application of Eisenstein, 268 App.Div. 320, 323, 51 N.Y.S.2d 811, 814 (1944), "destructive competition" was held

to mean competition which "would tend not only to damage but to destroy competition." *See, also*, Richmond Food Stores, Inc. v. State Milk Commission, 204 Va. 46, 56–57, 129 S.E.2d 35, 42–43 (1963) ; State v. Wolkoff, 250 Minn. 504, 514–418, 85 N.W.2d 401, 409–411 (1957).

34. Note that Barrett's temporary operations from Boise began on July 15, 1968 and have continued up to the present.

35. Both those discussed above and others set forth in the appendices to the Examiner's Report and Order.

there has been stiff competition for shipments originating at Boise between it, Morgan and National. This competition does not appear to be destructive or ruinous under the standards set forth *supra* because there is no evidence to the effect that such competition is or is likely to be materially disabling to Morgan or National or that such competition has caused or is likely to cause a deterioration in service.

For the reasons given above, the ICC's Order denying Barrett's Sub-No. 85 application must be set aside and the application remanded to it for reconsideration consistent with this Opinion and Order. In this reconsideration, the ICC should take additional evidence to determine if the situation has changed since 1970 when the last evidence was taken.[36]

36. The Court notes that it is now the middle of 1973 and so the ICC can and should take account of the results of Barrett's temporary operations in 1970, 1971, 1972 and the first half of 1973 in determining whether such operations are required by the public convenience and necessity on a permanent basis.