639 F.2d 1096
 NORFOLK & WESTERN RAILWAY COMPANY, Petitioner,
v.
UNITED STATES and Interstate Commerce Commission, Respondents.
Grand Trunk Western Railroad,/R Intervenor.
Grand Trunk Corporation,/R Intervenor.
Canadian National RR, Intervenor.
Southern Railway Co., Intervenor.
CANADIAN PACIFIC LIMITED, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
Grand Trunk Western Railroad and Grand Trunk Corporation,/R
Intervenors.
Canadian National Railway Company,/R Intervenor.
MICHIGAN INTERSTATE RAILWAY COMPANY, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
Railway Labor Executives' Association,/R Intervenor.
Grand Trunk Western Railroad and Grand Trunk Corporation,/R
Intervenors.
STATE OF MICHIGAN, DEPARTMENT OF TRANSPORTATION, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
Grand Trunk Western Railroad and Grand Trunk Corporation,/R
Intervenors.
Railway Labor Executives' Association,/R Intervenor.
 Nos. 79-1862, 80-1087, 80-1150 and 80-1164.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 3, 1980.
Decided Feb. 13, 1981.
 
 Charles H. White, Jr., Washington, D. C. (Steven A. Lauer, Washington, D. C., Donald M. Tolmie, Roanoke, Va., Gordon Miller, Q. C. on brief) for petitioners Norfolk and W. Ry. Co. and Canadian Pac. Limited.
 Charles W. Chapman, Washington, D. C. (Frank J. Kelley, Atty. Gen., Robert A. Derengoski, Sol. Gen., Louis J. Caruso, James L. Stropkai, Asst. Attys. Gen., Lansing, Mich., on brief) for petitioners State of Michigan, Dept. of Transp. and Michigan Interstate Ry. Co.
 Charles A. Horsky, Washington, D. C. (Donna Kohansky, James L. Tapley, R. Allan Wimbish, Peter S. Craig, Washington, D. C., on brief) for Southern Ry. Co.
 Henri F. Rush, Associate Gen. Counsel, Washington, D. C. (Richard A. Allen, Gen. Counsel, David Popowski, Interstate Commerce Commission, Sanford M. Litvack, Asst. Atty. Gen., Barry Grossman, Andrea Limmer, Dept. of Justice, Washington, D. C., on brief) for respondents Interstate Commerce Commission and United States of America.
 Basil Cole, Washington, D. C. (Robert P. Vom Eigen, Dechert, Price & Rhoads, Fritz R. Kahn, Lloyd John Osborne, Verner, Liipfert, Bernhard, McPherson & Alexander, William Mahoney, Joseph Guerrieri, Jr., Highsaw, Mahoney & Friedman, Washington, D. C., on brief) for intervenors Grand Trunk Western Ry. Co., Canadian National Ry. Co. and Railway Labor Executives Association.
 Before BUTZNER, Circuit Judge, FIELD, Senior Circuit Judge, and MURNAGHAN, Circuit Judge.
 MURNAGHAN, Circuit Judge:
 
 
 1
 As part of a liquidation of assets associated with the bankruptcy of Penn Central Transportation Company, the Pennsylvania Company ("Pennco") sought to sell the Detroit, Toledo and Ironton Railroad Company ("DT&I"). A contract, which was, of course, subject to the approval and authorization of the Interstate Commerce Commission before it could enter into effect[1] was worked out with the Norfolk and Western Railway Company ("N&W") and the Chesapeake & Ohio Railroad Company ("Chessie"),[2] each of which was to purchase 50%.
 
 
 2
 In reviewing the proposed acquisition of control, the ICC Administrative Law Judge concluded that the proposed purchase would be consistent with the public interest.[3] He further found however, that a sale to the Grand Trunk Western Railroad Co. ("GTW"), which had filed an inconsistent application, would be more beneficial, more consistent with the public interest.[4] His order afforded the DT&I a six months' opportunity to work out a satisfactory arrangement for a sale to the GTW and subsequently a contract acceptable to the parties, Pennco and the GTW, was entered, and, on June 3, 1980, approved by the ICC.
 
 
 3
 In the meantime, the Chessie abandoned efforts to secure the bargain under which it and the N&W would become 50% owners. It withdrew and now favors the DT&I purchase by the GTW.
 
 
 4
 Assuming that the purchase which has the blessing of the ICC and the withdrawal of the Chessie System as a partner do not render all contentions of the N&W moot, and that it still has standing to oppose the DT&I acquisition by GTW on the grounds that it contravenes public interest, we are satisfied that the ICC's inherent power permitted it: (a) in connection with considering a proposed merger of railroads, to suggest to one of the parties that it, as prospective seller, instead seek to work out an arrangement with another possible acquiring railroad; (b) in favoring acquisition by the GTW, not to treat the indirect ownership of GTW by Canadian National Railway Co., a company 100% owned by the Government of Canada, as an absolute bar to the transaction. When a subsidiary operates a railroad not in Canada but in the United States, the fact that a foreign sovereign owns the parent does not render the railroad operated in the United States any less subject to applicable rules and regulations pertaining to privately owned railroads.
 
 
 5
 The language of the 4R Act (45 U.S.C. § 801(a)) states: "It is the purpose of the Congress to promote the revitalization of such railway system, so that this mode of transportation will remain viable in the private sector of the economy." Indirect ownership by a foreign sovereign, in the circumstances here presented, does not remove the GTW and the DT&I from the private sector of the economy.
 
 
 6
 The other objections voiced to the GTW-DT&I acquisition of control transaction[5] may be easily put aside. One concerns not the merger itself, but rather the separate issue of whether conditions should be imposed on an otherwise valid acquisition of control. The other, assuming considerations of competition for traffic in Canada by Canadian railroads are to be reviewed at all,[6] clearly fell within the ICC's discretion and substantial evidence supported its conclusions.
 
 
 7
 Accordingly, the merger approved by the ICC is lawful and we decline to deny its enforcement.
 
 
 8
 In affirming the merger, the ICC determined that DT&I conditions, which it has consistently since 1951 applied in like railroad merger circumstances,[7] were not necessary and should be eliminated.[8]
 
 
 9
 While a departure from prior policy may well be within the power of the ICC, if the power is properly exercised, nevertheless the manner in which the ICC acted with respect to non-application of the DT&I conditions dictates that we remand to the ICC for further consideration.[9] It was only after conclusion of the protracted evidentiary hearings in the matter in which the GTW-DT&I merger was approved that the ICC, for the first time, suggested that the theretofore universal practice of adopting the DT&I conditions might not be followed.[10] In notifications to the parties of a posthearing session for the purposes of oral argument, to be held less than 30 days thereafter, the ICC suggested that the parties, if they cared to, might address (by argument only, of course) the question of whether or not DT&I conditions should be imposed. The announcement of the possibility that the conditions might not be applied was novel, and not reasonably foreseeable to the parties at any time while the evidentiary hearings were in progress. The procedure obviously allowed the interested parties no opportunity for adducing factual support for any contentions favoring the continuation, for the purposes of the DT&I-GTW merger, of the DT&I conditions.
 
 
 10
 It appears that an adequate presentation could well reasonably require the introduction of relevant evidence. Consequently, while the merger itself is approved, we remand for the ICC to permit evidentiary hearings prior to reaching any conclusion as to whether the DT&I conditions are or are not appropriate to the merger.[11]
 
 
 11
 In view of that disposition, it is premature to decide whether, whatever the outcome on the general question as to the applicability of the DT&I conditions, a contract between the Southern Railway ("Southern") and GTW conferring on Southern the benefit of the DT&I conditions should, for independent reasons, be allowed to take effect.
 
 
 12
 Similarly, in view of the possible effect on the attitude of the ICC should it, following a full evidentiary hearing, decide after all to impose the DT&I conditions, we remand for further consideration an application by the Michigan Interstate Railway Company ("MI") and the State of Michigan for the imposition of certain conditions favorable to the Ann Arbor Railroad System as a concomitant of the merger approval. The overlap between the conditions sought by MI and Michigan and the DT&I conditions is substantial. While it is to be doubted that a request by Canadian Pacific Limited ("CP") that "puller service" to its advantage be maintained has been preserved for judicial review, inasmuch as we are directing reconsideration of all other requests for imposition of traffic conditions, we should be understood as not foreclosing a presentation by CP if it in fact has intended to pursue the matter. At this stage we, of course, express no view as to whether the conditions proposed by MI and Michigan, or the benefit sought by CP, should be imposed.
 
 
 13
 In thus ordering remand, we are not unmindful of the ICC's contemporaneous rulemaking approach in Rulemaking Concerning Traffic Protective Conditions in Railroad Consolidation Proceedings, Ex Parte No. 282 (Sub-No. 5), issued July 17, 1980, where it has proposed to remove all traffic protective conditions imposed in railroad consolidations, both past and present.[12] Nothing written here need restrict or otherwise interfere with that proceeding or with efforts to harmonize it and the instant adjudication proceeding.
 
 
 14
 AFFIRMED IN PART AND REMANDED IN PART.
 
 
 
 [1]
 49 U.S.C. § 11343(a)
 
 
 [2]
 More precisely its affiliate or subsidiary, the Baltimore and Ohio Railroad Company
 
 
 [3]
 The ICC, on review, upset that finding on the basis that the purchase by the N&W and the Chessie would have an anticompetitive effect. In light of our disposition on other matters, we have no occasion to investigate the question of whether that ICC adjustment of the ALJ's findings was in error. See, however, McLean Trucking Co. v. United States, 321 U.S. 67, 87, 64 S.Ct. 370, 380, 88 L.Ed. 544 (1944), to the effect that a merger's anti-competitive effect should be judged by whether it would promote national transportation policy. The Court stated that because a merger does not violate the anti-trust laws "in no sense relieves the Commission of its duty ... to consider the effect of the merger on competitors and on the general competitive situation in the industry in the light of the objectives of national transportation policy." Cf. 45 U.S.C. § 801 (the Railroad Revitalization and Regulatory Reform (4R) Act of 1976)
 
 
 [4]
 We interpret the opinion of the ALJ as embodying two relative, interdependent, conditional findings as to consistency with the public interest, not the absolute finding in its favor for which the N&W contends:
 
 
 [1]
 If the GTW cannot work out a satisfactory agreement with Pennco, the acquisition by N&W and Chessie would be consistent with the public interest; and
 
 
 [2]
 If a satisfactory agreement between GTW and Pennco eventuates, the public interest would be better served by a purchase of DT&I by GTW
 The precise language of the ALJ reads: "The inconsistent proposal of Grand Trunk Western is considered to be the most desirable and it will be given primary approval. Allowances are made, however, for secondary approval of the N&W-Chessie proposal, should the GTW purchase of the DTI not be consummated."
 Consequently, the N&W is without justification in its reliance on 49 U.S.C. § 11344(c): "The Commission shall approve and authorize a transaction under this section when it finds the transaction is consistent with the public interest." The two findings of consistency with the public interest each included the contingency of actual outcome of the GTW-Pennco negotiations. Only on resolution of that uncertainty did the finding on public interest fully mature. Only the finding in favor of the GTW-DT&I merger ever completely ripened.
 It is a mischaracterization by N&W to refer to the situation as one in which the ICC compelled a GTW-DT&I merger. Pennco remained free not to negotiate with GTW, or, having negotiated, not to enter an agreement.
 
 
 [5]
 They are, namely, (a) an asserted failure to define the relevant market, and (b) the absence of a rulemaking procedure preceding the decision not to impose traffic protective conditions on the ICC's approval and authorization of the acquisition of control
 
 
 [6]
 See 49 U.S.C. 10501(a) which confers on the ICC "jurisdiction over transportation ... to the extent the transportation is in the United States...."
 
 
 [7]
 The Brief of the ICC and of the United States speaks at page 28 of "its (the Commission's) prior inflexible approach of routine imposition of the 'DT& I' traffic protective conditions."
 
 
 [8]
 The conditions require acquiring railroads to (1) maintain and keep open all routes and channels of trade via existing junctions and gateways; (2) maintain neutrality in handling traffic so as to permit equal opportunity for service to and from all lines reaching the rails of the acquired company without discrimination; (3) continue existing traffic and operating relationships in effect between the acquired company and all connecting lines; (4) handle all traffic without discrimination in promptness or frequency of service as between competing carriers; and (5) forego any restraint or curtailment of the right to route traffic over any or all existing routes and gateways. Detroit, Toledo & Ironton Rr. Control, 275 I.C.C. 455, 492 (1950)
 
 
 [9]
 The ICC, under the Administrative Procedure Act, 5 U.S.C. § 554(c), was obliged to give all parties interested in the adjudication an opportunity for "the submission and consideration of facts."
 
 
 [10]
 The ALJ had recommended imposition of the DT&I conditions
 
 
 [11]
 The supposed authority advanced by the Government for not disturbing the denial of the DT&I conditions is not supportive. United States v. Tucker Truck Lines, 344 U.S. 33, 35-37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952) concerned a belated objection to the appointment of the hearing officer in a manner not complying with the Administrative Procedure Act. United States v. Hancock Truck Lines, 324 U.S. 774, 778, 65 S.Ct. 1003, 1005, 89 L.Ed. 1357 (1945) dealt with a situation where there had been an express waiver of an objection which subsequently a party sought to raise. In Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 553-54, 98 S.Ct. 1197, 1216, 55 L.Ed.2d 460 (1978), the only case involving an issue of a claimed barring of factual information from the record, the Supreme Court expressly noted the agency's "willingness to receive evidence on the matters."
 
 
 [12]
 It is not irrelevant that the Notice of Proposed Rulemaking encourages anyone enjoying the benefit of the protective conditions "to file comments demonstrating that the facts of a particular situation warrant the continuation of the past interpretation and present enforcement of these conditions as to them." (Emphasis added)